702 A.2d 781

**Lewis William BURRAL**

v.

**STATE of Maryland.**

**No. 1809, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Nov. 26, 1997.

Kreg Paul Greer, Assigned Public Defender, Towson, for Appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and M. Kenneth Long, State's Atty. for Washington County, Hagerstown, on brief), for Appellee.

Submitted before CATHELL and SONNER, JJ., and ROBERT C. MURPHY, Judge (retired), Specially Assigned.

SONNER, Judge.

In the early morning hours of February 27, 1989, a truck driver found the body of a young man in a ditch by the side of Interstate 81 in Pennsylvania. The first Pennsylvania State Trooper on the scene, Edward Vymazal, found no evidence of a car accident and determined that the man had died as a result of a homicide. The Pennsylvania police later identified the body as that of Jeffrey Fiddler, a twenty-one year old resident of Hagerstown, Maryland, and began a cooperative investigation with the Hagerstown Police Department.

After an autopsy, Dr. Neil Hoffman, a Pennsylvania pathologist, determined that the cause of death was a stab wound to the chest, which caused heavy bleeding and death within a half hour of the injury. The fatal wound was approximately eight inches deep, indicating that the killer used a large knife. Dirt

and grass present on the victim's body indicated that the body had been moved after death. Dr. Hoffman testified that the injuries sustained by the victim would have caused large pools of blood at the crime scene; however, Trooper Donald Paul, a criminal investigator for the Pennsylvania State Police, testified that there was very little blood in the roadside ravine where the body had been found.

This evidence from the autopsy and the lack of evidence of a struggle at the scene indicated that the murder had occurred elsewhere. As the joint investigation proceeded and suspects were questioned, authorities concluded that the murder had, in fact, occurred in Maryland, and the Hagerstown, Maryland police assumed primary responsibility for the investigation. The Hagerstown police learned that the defendant, Lewis William Burral, met with Jeffrey Fiddler and brothers Eddie and Willie Stouffer in Clear Spring, Maryland, on the night of the murder. The men met at the home of Willie Stouffer's girlfriend and then drove up into the mountains to smoke marijuana. It was there, according to statements made by the defendant, that the murder occurred. Burral told police that he helped Eddie Stouffer stuff the body in the back of a car and then dump the body at a location just beyond the Pennsylvania state line.

On March 15, 1996, a jury in the Circuit Court for Washington County (McDowell, J.) convicted Burral of second degree murder for his participation in the death of Jeffrey Fiddler. The court sentenced Burral to thirty years in prison.

Appellant noted an appeal and raised the following issues, which we restate slightly for clarity:

I. Whether there was sufficient evidence to show that the murder had occurred in Maryland;

II. Whether the trial court properly admitted testimony that the defendant had been in prison;

III. Whether the trial court properly barred the post-hypnotic recollection testimony of a defense witness;

IV. Whether the trial court properly excluded testimony by a witness who was not listed on defendant's voir dire list.

We answer each issue in the affirmative and, accordingly, affirm.

## II.

 The first issue Burral raises is whether there was sufficient evidence to show that the murder of Jeffrey Fiddler occurred in Maryland so as to vest the trial court with jurisdiction. Jurisdiction must be proved by the State beyond a reasonable doubt. *State v. Jones,* 51 Md.App. 321, 340, 443 A.2d 967 (1982), vacated on other grounds, 298 Md. 634, 471 A.2d 1055 (1984). Appellant argues that, because the body was found in Pennsylvania, and there is a permissive inference that jurisdiction over a homicide lies with the state in which the body was found, the State of Maryland lacks jurisdiction. *Breeding v. State,* 220 Md. 193, 200, 151 A.2d 743 (1959) (citations omitted). That is, as the trial judge instructed in this case, the jury is permitted, though not required, to infer that the murder occurred in Pennsylvania. See *Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985) ("A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.") Indeed, this inference may be erased, or, as one commentator has put it, "the bubble is burst" by sufficient evidence to the contrary.[1] In the case at bar, we find that the State adduced enough evidence not only to overcome this inference, but also to prove beyond a reasonable doubt that the murder occurred in Maryland.

 Although Jeffrey Fiddler's body was found in Pennsylvania, it was clear that the act of murder did not occur where

---

1. *See 2 McCormick on Evidence* § 344 (John William Strong, ed., 4th ed.1992).

the body was found.[2] First, there was testimony from Pennsylvania State Trooper Donald Paul, the State Police's criminal investigator who examined the body at the scene. Trooper Paul testified in the State's case-in-chief that, although he observed a "very deep stab wound" on the victim's body, he found "very little" blood. He further testified that "it did not appear as though the actual stabbing occurred at that location."

In addition, the State's forensic expert, Dr. Neil Hoffman, testified that the particular stab wound that Jeffrey Fiddler received would have resulted in the loss of a "large amount of blood," and not just the few drops that Trooper Paul actually found on the body. Finally, Burral himself told Hagerstown police that he assisted Eddie Stouffer in stuffing Fiddler's body into the trunk of Stouffer's car, which supports a finding that the body was eventually transported. We conclude that, under these circumstances, where there is actually affirmative evidence that the murder occurred elsewhere, the inference regarding the location of the murder is much weaker than if no such evidence existed. Therefore, the jury could reasonably have rejected the inference that Pennsylvania was the location of the murder. Accord *People v. Sims,* 244 Ill.App.3d 966, 184 Ill.Dec. 135, 612 N.E.2d 1011 (1993).

Even though the evidence was sufficient to overcome the inference that the murder occurred in Pennsylvania, the State still bore the burden of proving beyond a reasonable doubt that Maryland had jurisdiction. *Jones,* 51 Md.App. at 340, 443 A.2d 967. We believe the State satisfied its burden. First, Hagerstown Police Detective Richard Johnson testified that Burral made a statement to him, in which Burral stated:

> He [Burral] was present on a dirt road up in the Clear Spring, Maryland area when Eddie Stouffer had, uh, stabbed Jeff Fiddler and killed him and placed him into the

---

**2.** Appellant concedes as much in his brief to this Court: "Of course there was evidence that [Fiddler] was not killed at the precise spot where his body was found." Brief for Appellant at 11.

trunk of a white VW Rabbit ... and Mr. Burral assisted Stouffer in pushing the vehicle down to a residence.

In addition, Sergeant Ronald Graves, also of the Hagerstown Police Department, obtained a second statement from the defendant. Sgt. Graves testified to what Burral said in this statement:

According to Mr. Burral, he was in front of Rocky's Pizza in the square when he was picked up by Willie Stouffer and they went to Stouffer's girlfriend's home in Clearspring [sic]. Uh, while they were in Clearspring, Eddie Stouffer and Jeff Fiddler showed up ... [T]hey then got into Eddie Stouffer's vehicle and drove up into the mountains to smoke some marijuana ... [Eddie Stouffer] stabbed Jeff Fiddler ... and they put [his] body in the back of a car....

Burral argues that this evidence is insufficient to support the jury's conclusion that the murder was committed in Maryland. He argues that Clear Spring, Maryland, is "very near both the Pennsylvania and West Virginia borders," and that, "given the geography of the region, it is just as likely, if not more likely, that the excursion took the party into Pennsylvania or West Virginia." We disagree.

■ Under Md.Rule 5–201, we take judicial notice of a topographic map prepared by the U.S. Geological Survey, which shows that there are several dirt roads and mountains within one mile of Clear Spring proper. By contrast, the Pennsylvania–Maryland border is approximately three miles from Clear Spring, and no dirt road leads directly into Pennsylvania. As a result, we find it reasonable for a jury sitting in Washington County, Maryland, with first-hand knowledge of the local terrain, to conclude that the murder occurred in Maryland. The testimony elicited by the State, while perhaps not crystal clear, was enough to send the issue to the jury.[3]

---

3. Though we affirm, we are somewhat perplexed that the State was not able to prove jurisdiction more persuasively. Appropriate investigation might well have closed the door to an appeal on this issue. For instance, in light of the defendant's own statement that he and Stouffer pushed the car down to a residence, the State should have been able to

The jury was properly instructed[4] and we will not interfere with the jury's fact-finding prerogative. *See, e.g., Emory v. State,* 101 Md.App. 585, 622, 647 A.2d 1243 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995); *Wynn v. State,* 117 Md.App. 133, 150, 699 A.2d 512, 520 (1997).

## III.

Next, appellant argues that the trial court erred when it admitted Lieutenant Robert G. Mutter's testimony that defendant had previously been in prison. The statement occurred during the following colloquy on redirect examination of Lt. Mutter. Lt. Mutter was testifying about an interview he had with Burral.

[State's Attorney]: I'd like to direct your attention please, to page 19 of the statement, with your statement, "What do you think happened to this guy?" ... would you read that please.

[Lieutenant Mutter]: Okay. "What do you think happened to this guy? You, you're smart you're intelligent, streetwise, what do you think really happened? Cause you've been on the streets, you've been to prison ... what do you think went down ... in your own mind?"

[Defense Counsel]: Excuse me, Detective. I need to interrupt, your Honor, it's defendant's motion to strike the previous testimony as to unrelated offenses ...

[The Court]: Overruled.

---

show the exact location of this residence and its proximity to the Maryland State line.

4. Judge McDowell instructed the jury that "[t]he finding of a dead body in a certain location raises a rebuttable presumption, or supports and [sic] inference, that the mortal blow was struck there. Either direct or circumstantial evidence [that] a crime took place at a particular location within Maryland is sufficient to establish jurisdiction. However, if you cannot find that the offense ... was committed within the territorial limits of the State of Maryland, then you must find the defendant not guilty."

Burral argues that Mutter's inadvertent reference to prison amounts to inadmissible "other crimes" evidence under Md. Rule 5–404(b). We disagree.

■ Maryland Rule 5–404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith . . .

There are, however, well-recognized exceptions to this general rule. The Rule goes on to provide that other crimes evidence may be admissible

for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

*See also Ayers v. State,* 335 Md. 602, 631, 645 A.2d 22, 36 (1994); *Harris v. State,* 324 Md. 490, 501, 597 A.2d 956, 962 (1991). The list of exceptions provided in the Rule is not "a laundry list of finite exceptions . . . but rather a representative list of examples" of permissible uses of other crimes evidence. *Merzbacher v. State,* 346 Md. 391, 407, 697 A.2d 432, 440 (1997) (citing *Harris,* 324 Md. at 501, 597 A.2d at 962). Indeed, with so many exceptions to the general ban on other crimes evidence, the Court of Appeals has recently noted that the "exceptions 'appear to swallow the rule.' " *Ayers,* 335 Md. at 632, 645 A.2d 22 (quoting *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757 (1978)). In short, there remains only one purpose for which other crimes evidence, in and of itself, may not be admitted, that is to "prove guilt of the offense for which the defendant is on trial." *Ayers,* at 630, 645 A.2d 22.

■ In our view, Lt. Mutter's testimony in this case regarding Burral's prison record was not offered to prove that Burral was guilty of second degree murder in the case at bar. The complete statement, "You've been on the streets, you've been to prison, what do you think went down," is an oblique, ambiguous reference to previous criminal activity, at best, and not the kind of direct and unequivocal evidence that the Rule contemplates excluding. The State's conduct in eliciting Lt.

Mutter's testimony was not a deliberate attempt to tarnish the defendant's character in the eyes of the jury.

We are not unmindful of the potential prejudicial impact of prior crimes evidence. Trial judges should, indeed, be vigilant in exercising their discretion over admitting other crimes evidence, but we do not find the testimony in this case to be within the ambit of Md.Rule 5–404(b).

■ Moreover, even if we were to conclude that the reference to Burral's prison record is impermissible other crimes evidence, which we do not, we would not hesitate to find the error harmless beyond a reasonable doubt. See *Burch v. State*, 346 Md. 253, 271, 696 A.2d 443, 452 (1997). The evidence at trial included testimony by two police officers to inculpatory statements made by Burral, as well as evidence that Burral fled to Florida in the wake of Fiddler's murder. In light of the rather stark evidence of guilt in this case, we are satisfied that there is "no reasonable possibility that the evidence complained of ... contributed to the rendition of the guilty verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

## IV.

■ The third issue Burral raises on appeal is whether the trial court properly barred the post-hypnotic testimony of Lisa Wallech, a defense witness. At trial, appellant sought to question Wallech regarding a statement she made after undergoing hypnosis, which was inconsistent with a statement she made before undergoing hypnosis. The trial court, relying on *State v. Collins*, 296 Md. 670, 464 A.2d 1028 (1983), ruled that those portions of Wallech's testimony that were inconsistent with her pre-hypnosis statements were inadmissible. We find no error in the court's ruling.

Early in the investigation of Jeffrey Fiddler's murder, Wallech told police that she witnessed a fight on the night of the murder between Bobby Schell and Jimmy Fiddler, the victim's brother. The police asked Wallech to submit to hypnosis. Wallech then claimed that, although she "always thought it

was Jimmy [fighting with Bobby Schell] until I went under hypnosis," after the hypnosis "it came to [her] that it was Jeff." Wallech was also prepared to testify to other events, her memory of which was not affected by the hypnosis.

Following an examination of Wallech out of the jury's presence, the trial court ruled that Wallech could testify as a defense witness, subject to the restriction that Burral could not examine the witness as to whether she saw Jimmy or Jeffrey Fiddler with Bobby Schell on the night of the murder. That evidence was not based on the witness's independent memory, but rather induced solely as a result of hypnosis and was, therefore, inadmissible under Maryland law. *Collins*, 296 Md. at 702, 464 A.2d at 1044. In *Collins*, the Court held that a witness who undergoes hypnosis can testify only "in accord with statements which it clearly can be demonstrated he made prior to hypnosis." *Id.* We find that *Collins* was, indeed, dispositive of this issue and that the trial judge correctly applied it.

Appellant argues that Collins has been "called into question" by the Supreme Court's decision in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). We disagree. In *Rock*, the Court held that a State may not *per se* exclude a *defendant's* hypnotically refreshed testimony. The Court based its decision explicitly on a defendant's constitutional right to testify on his own behalf, writing, "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all post-hypnosis recollections." *Rock*, 483 U.S. at 61, 107 S.Ct. at 2714. Appellant does not dispute that the holding in *Rock* applies only to defendants, but argues that "the reasoning of the Court is equally applicable to a defendant's Sixth Amendment right to present other witnesses in his own defense." We find no language in *Rock*, or in any subsequent Supreme Court decision, to support appellant's argument. As we stated above, *Collins* is the controlling authority in this case, and we see no reason to depart from it now.

## V.

██ Finally, appellant argues that the lower court abused its discretion by preventing one of his witnesses from testifying. The trial judge excluded Matthew Stratton as a witness because he was not listed on the voir dire witness list and, as a result, there was concern that members of the jury might have some prior relationship with Stratton. Although Burral concedes that he knew of Stratton's testimony well before trial and did not "diligently identify" the witness in time for jury voir dire, he argues, nevertheless, that the court infringed upon his right to present witnesses by not allowing Stratton to take the stand. Our review of the record shows that the trial judge had already allowed one unlisted defense witness to testify, namely Roddy Pifer, and that Stratton's testimony would have been duplicative of Pifer's testimony. Accordingly, we find no abuse of discretion.

██ The trial judge has wide discretion in the conduct of a trial and we will not disturb the exercise of that discretion unless it has been clearly abused. *Smith v. State,* 299 Md. 158, 179, 472 A.2d 988 (1984) (citing *Poole v. State,* 295 Md. 167, 180, 453 A.2d 1218 (1983)). The court may, for example, exclude evidence, if necessary, to prevent "needless presentation of cumulative evidence." Md.Rule 5–403; *State v. Broberg,* 342 Md. 544, 553, n. 6, 677 A.2d 602 (1996). The court may also exclude witnesses whom the defense or the prosecution have failed to disclose for purposes of voir dire. *See Taliaferro v. State,* 295 Md. 376, 388–89, 456 A.2d 29, 36–37 (1983).

In *Taliaferro,* the Court held that it was not an abuse of discretion or a denial of due process to prevent defendant's alibi witness from testifying, where the defendant did not disclose the witness until the close of the State's case, and the proffered witness would have been the defendant's only witness. Citing *State ex rel. Simos v. Burke,* 41 Wis.2d at 129, 163 N.W.2d at 182 (1968), the Court stated that "[t]he interests of the prosecution, defense, and public are served by such facilitating of orderly, uninterrupted trials for the seeking of

the truth and the protection of the rights of all concerned." *Taliaferro*, 295 Md. at 398, 456 A.2d 29. We agree, and hold that the rationale expressed in *Taliaferro*, namely that a trial judge may exclude non-disclosed alibi witnesses, can be extended to cover the exclusion of other witnesses whom the defense unjustifiably fails to disclose.

At trial, defense witness Roddy Pifer testified to statements made by Robert Schell at the Washington County Detention Center in 1990, when Pifer and Schell were inmates there. Pifer testified that Schell was "telling tales" and "trying to make his tale bigger than the other guy." Specifically, Pifer said that Schell made the following statement:

He said that he got into an argument with a fella, it was over a girl, he was seein' this girl, he caught the other guy with this girl and he took care of it. He said he stabbed him, he said he rolled him up in a carpet and then he said, we carried him out and put him in a car and we dumped him. But he did not say who we was.[5]

Following Pifer's testimony, but after two subsequent defense witnesses, Burral called Matthew Stratton as a witness. The State objected, arguing that Stratton, like Roddy Pifer, was not listed on the witness voir dire list and, therefore, should not be permitted to testify. Appellant then made the following proffer of Stratton's testimony:

If, if the witness were permitted to testify ... he would tell the jury that, in fact, he was present at the conversation at the [Detention Center] ... at which Mr. Pifer was also present ... That at that time Bobby Schell basically made statements indicating that he, in fact, had murdered, or killed, or caused the death of Jeffrey Fiddler.

After hearing argument from the State, the court ruled that Stratton was not permitted to testify.

---

5. In his brief to this Court, appellant argues that Schell's statement "indicate[s] that [Schell] ... caused Jeff Fiddler's death but that it had been accidental." Appellant's Brief at 13.

We express no opinion as to whether, or to what extent, Schell's statement serves to exculpate appellant. We merely note that, if a court may, in the proper exercise of discretion, exclude a defendant's alibi witness—indeed, the defendant's only witness—as *Taliaferro* held, a trial court could certainly exclude the testimony proffered here.

■ Having concluded that the *Taliaferro* rule controls, we apply the following five factors set out in *Taliaferro* to determine whether the lower court's sanction was an abuse of discretion:

(1) whether the disclosure violation was technical or substantial;

(2) the timing of the ultimate disclosure;

(3) the reason, if any, for the violation;

(4) the degree of prejudice to the parties;

(5) whether any prejudice might be cured by a postponement and, if so, the overall desirability of a continuance.

*Id.* at 390–91, 456 A.2d 29. Upon consideration of these factors, we conclude that the lower court properly exercised its discretion in excluding Stratton as a defense witness. Burral knew of Stratton well before trial, yet provided no justification for waiting until midway through the trial before disclosing him. Moreover, Stratton's testimony would have been similar, if not exactly the same, as Roddy Pifer's, a defense witness already permitted to testify, even though he, too, had not been disclosed. Appellant was not prejudiced, therefore, by Stratton's exclusion. A postponement was not requested, nor would it have been desirable at that late stage of the proceedings.

**JUDGMENT AFFIRMED; APPELLANT TO PAY COSTS.**