712 A.2d 96

**Brian Lamont SOWELL and Terrell Roshsay Pinkney**

v.

**STATE of Maryland.**

No. 1100, Sept. Term, 1997.

Court of Special Appeals of Maryland.

June 26, 1998.

224

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant, Sowell, and Kreg Paul Greer, Assigned Public Defender, Towson, submitted on the brief, for appellant, Pinkney.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before DAVIS and SONNER, JJ., and JAMES S. GETTY, Judge (retired), Specially Assigned.

DAVIS, Judge.

Brian Lamont Sowell and Terrell Roshsay Pinkney, appellants, were convicted by a jury in the Circuit Court for Prince George's County. Sowell was convicted and sentenced as follows: (1) armed robbery—twenty years, (2) robbery—merged, (3) use of a handgun—fifteen years, consecutive to the armed robbery conviction, (4) use of a handgun—fifteen years, consecutive to the armed robbery conviction and, (5) first degree assault—ten years consecutive to all other convictions. Pinkney was convicted and sentenced as follows: (1) armed robbery—twenty years, with all but ten years suspended, (2) robbery—merged into the armed robbery conviction, (3) use of a handgun—twenty years, with all but fifteen years

suspended, consecutive to the armed robbery conviction, (4) false imprisonment—merged into the first degree assault conviction, (5) use of a handgun—fifteen years, consecutive to the armed robbery conviction, and (6) first degree assault—fifteen years, with all but five years suspended, consecutive to the armed robbery conviction.

Both appellants ask the following questions in this appeal:

I. Did the trial court err in admitting irrelevant and prejudicial evidence and in permitting improper argument?

II. Did the trial court err in refusing to permit proper impeachment of a key State witness?

III. Did the trial court err in refusing to permit timely cross-examination of a key State witness or in the alternative denying a motion for a mistrial?

In addition, Pinkney also asks:

IV. Did the trial court err in overruling [his] objection to the question, "Why do you call him 'Monster?'"

V. Did the court err in allowing inadmissible hearsay through Detective Jernigan with regard to clothes worn by [him]?

Also, Sowell asks:

VI. Was the evidence sufficient to sustain the convictions?

## FACTS

Delisa Holmes, the office manager of Recycling Incorporated, received a telephone call from Sowell, who was employed by Recycling, inquiring about the payroll. She told him that it would be paid in cash, and would be ready after twelve noon. Sowell picked up his pay at 12:30 p.m.

Three men entered the business approximately one hour later. One man approached another person, Brian Fowler, and brandished a gun. A second man pointed a gun at Holmes's head and demanded cash. She gave him $14,600.

Pinkney was identified by William Grigsby, who worked at a business next door to Recycling Incorporated. He testified that he saw three black men walking toward the recycling company and, in a few minutes, saw them leaving the establishment, and "jog straight across in front of me." He identified Pinkney as one of the three men he had seen.

Anthony Williams, who knew both Sowell and Pinkney, testified that approximately a week before the offenses, Sowell had told him about a plan to rob the recycling company. He stated that Sowell was very insistent and persistent about robbing the place.

The day after the robbery, Williams talked to both Sowell and Pinkney. Williams recounted that Sowell "said it was easy, just as he had planned." Williams also testified that Sowell said, "Smoot, Lucky [Sewell], Monster [Pinkney] and another guy" were involved. Williams stated that Pinkney also confirmed that he, Smoot and "another guy" went in the company while Oliver "Lucky" Sewell was the driver. At the time Williams spoke to appellants, they both had a "lot" of money.

## I

Both appellants first ask, "Did the trial court err in admitting irrelevant and prejudicial evidence and in permitting improper argument?" They argue that it was error for the trial court to permit Williams to testify that after the robbery, while attempting to flee, Smoot "ran over a police officer," and was shot by a police officer. They also claim that it was error to allow the State, in closing argument, to amplify the prejudice "by the unnecessary highlighting of the police assault."

■ Sowell's attorney, during his opening statement, first mentioned that Smoot was shot while attempting to flee, that Smoot escaped, was treated at a hospital, and then arrested for his participation in the events. Subsequently, Williams was allowed to testify that Pinkney told him what had happened to Smoot when Williams saw Sowell and Pinkney a few hours after the robbery.

■ The admissibility of evidence, including rulings on its relevance, are left to the sound discretion of the trial court and, absent a showing of abuse of that discretion, will not be disturbed on appeal. *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991). Trial courts must decide whether the evidence is relevant and whether the probative value of the evidence outweighs any unfair prejudice. *Moore v. State,* 84 Md.App. 165, 172, 578 A.2d 304, *cert. denied,* 321 Md. 385, 582 A.2d 1256 (1990).

In the case before us, the evidence established the sequence of events. It was admissible to show participation in the robbery by establishing knowledge of what happened to another participant. There was no evidence that either Sowell or Pinkney were involved in Smoot's actions or the shooting. No prejudice has been shown.

■ During closing argument, the prosecutor argued, in accordance with the testimony of Williams, that counsel had been selective in his opening statement as to what he had told the jury. The prosecutor observed that counsel had not informed the jury that Smoot "had run over a police officer." The prosecutor asserted that this was because both counsel were "trying to frame this case in a certain way that benefits their clients." The permissible scope of closing argument is a matter left to the sound discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused. *Hunt v. State,* 321 Md. 387, 435, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), citing *Booth v. State,* 306 Md. 172, 210–11, 507 A.2d 1098 (1986), *vacated in part,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

■ Moreover, when Sowell's counsel objected to the prosecutor's argument, no request for further relief was made. The issue has been waived. *See Hairston v. State,* 68 Md.App. 230, 511 A.2d 73, *cert. denied,* 307 Md. 597, 516 A.2d 567 (1986). Pinkney's counsel did not object. He waived any claim of error as well. *See Osburn v. State,* 301 Md. 250, 482 A.2d 905 (1984).

■ Even if the issue had been properly preserved, there was no error or abuse in allowing the argument. The purpose of eliciting evidence of Smoot's confrontation with the police was not to establish the guilt of appellants, either directly or by association. The prosecutor was simply using the incident to show that lawyers, during closing arguments, selectively recall the facts to benefit their side of the case.

## II

Appellants next ask, "Did the trial court err in refusing to permit proper impeachment of a key State witness [Oliver "Lucky" Sewell]?"

Prior to trial, the prosecutor informed the trial court of "Lucky" Sewell's prior convictions, which were assault and battery and destruction of property. The prosecutor noted that those convictions arose from initial charges of burglary and robbery and that there had been a guilty plea. Pinkney's counsel argued that he should be allowed to impeach "Lucky" with his prior bad acts, not just the convictions. Sowell adopted that argument. The court deferred ruling. When the State called "Lucky" Sewell, both appellants noted for the record their request to impeach him with "Lucky's" prior bad acts. The court said nothing. Neither appellant sought to impeach "Lucky" with any prior bad acts during cross-examination.

■ To preserve an objection to the exclusion of evidence, there must be a proffer of the substance and the relevance of the excluded testimony. There was no proffer of what the contents of any excluded testimony would have been. There is nothing to indicate what the prior bad acts were. The issue is not properly preserved. *See Bruce v. State,* 328 Md. 594, 616 A.2d 392 (1992).

## III

Appellants also contend, "The trial court erred in refusing to permit timely cross-examination of a key State witness or in the alternative denying a motion for a mistrial."

The State's examination of Williams continued until almost 5:00 p.m. on the afternoon of Thursday, April 17, 1997. When it concluded, there was a bench conference. The court stated that it did not wish to truncate anyone's examination, but that it had promised the jury that it would be out by 5:00 p.m. Pinkney's counsel objected to postponing the cross-examination of Williams, but Sowell's counsel stated that they could recess after the cross-examination by Pinkney's counsel. The court wanted either to have all the parties conclude the examination of the witness, or to recess. Pinkney's counsel insisted that he wanted to cross-examine Williams before taking a recess, but said that he would be "as quick as possible." The court responded that it did not want to rush anyone.

When the court inquired of the jurors if they could stay, one juror responded that she had to attend an evening class. The court then decided to adjourn the proceedings, and excused the jury over the weekend. Pinkney's attorney moved for a mistrial, asserting:

> What's happened is this, the jury has now gone home listening to the State's version of this man's testimony without that great engine designed to get at the truth or John Henry Wigmore cross-examination. I understand the woman going to school. I agree with you, there's not much you can do about that. I mean, that's a choice you, the gatekeeper, has [sic] to make. But I think you have to make choices in order to ensure that Mr. Pinkney receives a fair trial. I think based upon what has happened, we have a manifest necessity to declare a mistrial.

Sowell joined in the argument, noting that the State's examination had been "painfully slow." The court heard arguments, and ruled that there was no manifest necessity for a mistrial, and that counsel would have the opportunity to cross-examine on Monday.

The court was correct. A trial judge has broad discretion in the conduct of a trial, including the declaration of a mistrial. *Burral v. State,* 118 Md.App. 288, 702 A.2d 781

(1997). The granting of a mistrial is within the court's discretion, which will not be disturbed unless the defendant is so prejudiced that its denial is tantamount to an abuse of discretion. *Barrios v. State,* 118 Md.App. 384, 702 A.2d 961 (1997).

█ Here, no prejudice was shown. The record reflects that, after the weekend break, both defense counsel cross-examined and re-cross-examined Williams as much as they wished. In fact, the cross-examination, arguably, was more firmly impressed in the jury's mind during deliberation.

## IV

Appellant Pinkney contends, "The trial court erred in overruling [his] objection to the question, 'Why do you call him Monster.'"

Sewell was repeatedly asked by the State why Pinkney was referred to as "Monster." Over repeated objections, the State elicited the answer, "Because he's crazy. He's a bad person." The court ruled, "I am going to strike 'bad person.'" It instructed the jury to ignore the conclusion. Pinkney, however, insists that the comment that he was crazy was extremely prejudicial, arguing that the court should have sustained his objections to the questions regarding why his nickname was "Monster" in the first place. He asserts that any response as to why he was called "Monster" was prejudicial because it made him look like a "bad person."

█ Assuming, *arguendo,* that the issue is properly preserved, we perceive no error. A court has broad discretion in deciding what evidence is admissible. *See Burral, supra.* Sewell claimed that his actions, after he became aware of the fact that a robbery had just occurred, were motivated by his fear of Pinkney, based on Sewell's comment that Pinkney was a lunatic. Sewell was asked why he called Pinkney "Monster." Other persons called Pinkney by that name because they believed he was crazy. Sewell was explaining his reasons for fearing Pinkney.

Under the circumstances, we perceive neither error nor abuse of discretion.

## V

 Pinkney also contends, "The court erred in allowing inadmissible hearsay through Detective Jernigan with regard to clothes worn by Pinkney." He asserts that the court erred in permitting Detective Jernigan to testify that Mr. Lucas, a maintenance worker at the apartment complex, had identified a shirt and coat that Lucas had claimed belonged to Pinkney. Pinkney acknowledges that Jernigan's testimony was cumulative of Lucas's testimony.

 It was also cumulative to other evidence concerning what Pinkney was wearing at the time of the robbery, including the shirt itself, which was recovered from Sewell's car, and identified by Sewell as the shirt Pinkney was wearing. Jernigan testified that he removed the jacket from Pinkney at the time of the arrest. Erroneous admission of cumulative evidence is harmless error. *See Dorsey v. State,* 276 Md. 638, 652–53, 350 A.2d 665 (1976).

## VI

Appellant Sowell posits that the evidence adduced at trial, particularly that of Anthony Williams, showed that he was intricately involved in the preparation and counseling of the crimes rendering him an accessory before the fact, but that a critical element could not be inferred nor was shown directly from the evidence to render him a principal in the second degree, viz, presence at the scene of the crime. The State makes a labored attempt to bring appellant Sowell's participation within the ambit of principal by characterizing his presence as constructive. The Court of Appeals has observed that

> [p]resence (or absence) at the scene of the crime thus appears to be the key factor which at common law distinguished an accessory before the fact from a principal in the second degree. This presence could be constructive, as

noted by Blackstone. Perkins states at 660, "A person is regarded as constructively present, within the rules relating to parties in criminal cases, whenever he is cooperating with the perpetrator *and 'is so situated as to be able to aid him,* with a view known to the other, to insure success in the accomplishment of the common purpose[.]' "

*State v. Williamson,* 282 Md. 100, 105, 382 A.2d 588 (1978)(emphasis added; citation omitted).

Historically, the distinction between an accessory before the fact and a principal in the second degree is that the latter is physically available to lend aid and assistance to the primary actors should his help be needed, whether it be as a lookout or to be available to assist in the capacity of a principal in the first degree. WHARTON'S CRIMINAL LAW, § 110 (12th ed.) defines an accessory before the fact as

[one who] procures, counsels, or commands another to commit a felony for him but is not himself present, actually or constructively, when the felony is committed. If such person were present actually or constructively at the commission of the crime, he would be a principal and not an accessory.

*Id.* at 237 (footnotes omitted).

The Court of Appeals, in *State v. Ward,* 284 Md. 189, 191, 396 A.2d 1041 (1978), opined:

Maryland is one of the few, if not the only State, which has retained this doctrine [of accessoryship applicable to felonies] in virtually the same form as it existed at the time of William Blackstone in the 18th Century, and it represents the law of Maryland at the present time.

The Court further observed in *Ward* that England and every American jurisdiction except Maryland had abolished or modified the doctrine by legislative act, although apparently no jurisdiction has done so by judicial decision absent any type of legislative basis. *Id.* at 191, n. 3, 396 A.2d 1041

In *Lon Alec Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979), the Court of Appeals was asked to dispense with the

requirement that the principal be both convicted and sentenced, thereby establishing the commission of the crime by the primary actors, before the accessory before the fact could be put to trial. The Court of Appeals decided:

> On the other hand, we agree with the State that we should now change the technical common law procedural rule mandating that an accessory cannot be tried before the principal is sentenced. The fact that this rule became part of the law of Maryland in 1776 does not preclude such change. Recently in *Pope v. State,* 284 Md. 309, 334, 396 A.2d 1054, (1979), we assumed that misprision of felony was a common law crime and that it became part of this [S]tate's law in 1776, but we held that it no longer exists in Maryland, stating "that the common law is subject to change." 284 Md. at 341, 396 A.2d 1054. As it is often said, "the common law is not static but adopts itself to changing conditions and increasing knowledge." *Latz v. Latz a/k/a Schafer,* 10 Md.App. 720, 731, 272 A.2d 435 (1971), quoting *Maryland to use of Weaver v. O'Brien,* 140 F.Supp. 306, 311 (D.Md.1956).

*Id.* at 714–15, 404 A.2d 1073.

Holding that the "technical procedural rules accompanying the common law doctrine of accessoryship are illogical and 'shield accessories from punishment notwithstanding overwhelming evidence of their criminal assistance,'" the Court observed that "these procedural rules were probably devised by 14th and 15th Century English courts as a means of alleviating the harshness of the death penalty in all felony cases, but today they frequently operate 'to thwart justice and reduce judicial efficiency.'" *Id.* at 715, 404 A.2d 1073.

More to the point, the Court of Appeals, in *Watson v. State,* 208 Md. 210, 218, 117 A.2d 549 (1955), had opined:

> This distinguishing of the accessory before the fact from the principal is a pure technicality. It has no existence either in natural reason or the ordinary doctrines of the law. For in natural reason the procurer of a crime is not chargeable differently from the doer; and a familiar rule of

the common law is that what one does through another's agency is regarded as done by himself. Even the common law of crimes makes no distinction in the punishment between a principal and an accessory,—the offence of each being a felony, of which the penalty was originally death. Likewise in morals, there are circumstances wherein we attach more blame to the accessory before the fact than to his principal.

(Quoting 1 *Bishop, Criminal Law,* 9th Ed., sec. 673.)

Admittedly, the discussion in *Lewis* devolved upon a procedural requirement, different in character from the substantive issue of the degree of participation required to render one a principal. Nevertheless, the excerpt from *Watson* graphically demonstrates—and there are probably endless examples in support thereof—that the procurer or solicitor is the criminal agent who bears greater culpability than the primary actors because it is he who has planted the seed or, by his planning and preparation, put in motion the criminal adventure which, but for the accessory's involvement, might not have gone forward.

The State, in this case, as did the State in *Lon Alec Lewis,* faced with the task of overcoming the common law distinction between principals and accessories before the fact, argues:

In light of the illusory nature of the distinction and its detrimental impact on the administration of justice, this Court should *now* reject any distinction between principals in the second degree and accessories before the fact.... To permit him to escape liability based on a technicality that has no basis for continuing to exist cannot be contemplated.

In support of its plea that the distinction between accessories and principals is archaic and should be ended, the State summarizes the testimony of Williams in its brief before this Court to demonstrate Sowell's indispensable complicity without which it is unlikely the robbery would have been so flawlessly executed:

Anthony Williams testified that Sowell, prior to the robbery, attempted to get Williams to participate in the rob-

bery. Williams detailed that, about a week before the robbery, Sowell told him he knew where they could get some easy money and that Sowell had it "all planned out." Sowell told Williams that the target was the recycling company, that the company paid its employees in cash, and that he knew how to get in and out quickly. As the week progressed, Sowell became "more insistent and persistent about robbing the Recycling Center." Williams testified that Sowell had a "map of the Recycling Center with stick people resembling the . . . workers at the Recycling Center, where they would be at and who should we grab, and stuff like that." Sowell told Williams that a lady at a receptionist desk behind the glass would have envelopes containing cash with names on the envelopes. Sowell said that they should grab her. Sowell said that, because the owner's son would be present, the victims would probably not resist much for fear of getting the son shot. Sowell added that the owner probably would be the only one with a gun.

Williams said that Sowell told him this three or four times. On the evening before the robbery, Pinkney and some others were also present. Sowell had the map spread out on top of a greenish Honda. Pinkney was explaining where the people should be standing and what they should be doing, such as "who should go in, who should grab who and who should stand at the door." Sowell was describing where the individuals should be and who would give the most resistance. Sowell said the robbery should occur around 11:30 to 12:30. Sowell said that, while the robbery was occurring, he was going to be out on his route and that he would meet them back at Tuley [sic] Street after the robbery to split up the money.

Notwithstanding that he was essentially the mastermind in planning the criminal episode, the testimony of Williams indicates Sowell deliberately absented himself from the scene to avoid being detected or associated with the crime by his co-workers:

[APPELLANT SOWELL'S COUNSEL]: Now, one of the statements, I think you said Brian Sowell said he was going to work that day, right?

THE WITNESS: Yes.

[APPELLANT SOWELL'S COUNSEL]: So Brian Sowell said he was going to go to work that day, and when the robbery was committed be out on his route, right?

THE WITNESS: Yes.

[APPELLANT SOWELL'S COUNSEL]: So you are sure you heard Brian Sowell say that?

THE WITNESS: Yes.

. . .

THE WITNESS: He said he was going to go out on his route *so it wouldn't look like he had anything to do with it,* and that he would meet them back around Tooley Street right after everything happened, and then they would split the money up.

Thus, the record affirmatively establishes the absence of the "key factor" requisite to a conviction of Sowell as a principal— actual or constructive presence at the scene of the crime so situated as to be able to lend aid, assistance, counsel, or comfort "to insure success in the accomplishment of the common purpose." *Williamson,* 282 Md. at 105, 382 A.2d 588. Sowell's participation ended as he deliberately disassociated himself from the crime scene and the commission of the crime until *after* the robbery had been consummated when the proceeds would be divided.

Citing the Court's decision in *Pope,* 284 Md. at 341–42, 396 A.2d 1054, Judge Eldridge, speaking for the Court of Appeals, in *Lewis,* 285 Md. at 715, 404 A.2d 1073, discussed how a change in the common law may be legally effectuated:

[The common law] may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides.... It may also be changed by judicial decision.... We asserted in *Ass'n of Taxi Oprs. v. Yellow Cab Co.,* 198 Md. 181, 204, 82 A.2d 106 (1951): "We have frequently held that it is our

duty to determine the common law as it exists in this State...." The doctrine of *stare decisis* does not preclude the exercise of this duty. We declared in *White v. King,* 244 Md. 348, 354, 223 A.2d 763 (1966): "The doctrine of *stare decisis,* important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule has become unsound in the circumstances of modern life." *Accord, Hearst Corp. v. St. Dep't of A. & T.,* 269 Md. 625, 643–44, 308 A.2d 679 (1973).

As previously mentioned, appellant Sowell's involvement in the robbery was anything but passive or incidental. Indeed, the participation of Sowell in relation to that of the principal actors presents a compelling argument in favor of dispensing with the distinction between accessories before the fact and principals.

There is, of course, a major legal hurdle regarding the State's request. The argument, in *Lewis,* to change the rule mandating that an accessory cannot be tried before the principal is sentenced, was presented to the Maryland Court of Appeals, the State court of last resort authorized to set policy. It may well be that that Court would be favorably disposed to dispense with the distinction between accessories and principals, particularly principals in the second degree. Until and unless the Court of Appeals effectuates such a change, we hold that the evidence before the jury neither directly nor inferentially permitted a finding that Sowell was constructively or actually present at the scene of the crime. Therefore, he could have been convicted only of being an accessory before the fact, rather than a principal in the second degree. Accordingly, we must reverse the judgments of conviction of appellant Sowell.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED AS TO APPELLANT SOWELL.**

**JUDGMENTS AS TO APPELLANT PINKNEY AFFIRMED.**

COSTS TO BE PAID ONE HALF BY APPELLANT
PINKNEY AND ONE HALF BY PRINCE GEORGE'S
COUNTY.