724 A.2d 65

**Lewis William BURRAL**

v.

**STATE of Maryland.**

**No. 10, Sept. Term, 1998.**

Court of Appeals of Maryland.

Feb. 12, 1999.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER, and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

WILNER, Judge.

The issue in this appeal concerns the admissibility of hypnotically-enhanced testimony. In *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983), we concluded that such testimony did not meet the test of reliability adopted by this Court in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978) and was, for that reason, inadmissible. We held that testimony consistent with statements made by a witness prior to undergoing hypnosis was admissible, but not testimony based on recollections formed during or after the hypnosis. The exclusion of hypnotically-enhanced testimony was stated in the form of a *per se* exclusion; it did not depend on who the witness was, who called the witness to testify, or the circumstances of the case. *See also Simkus v. State,* 296 Md. 718, 464 A.2d 1055 (1983); *Grimes v. State,* 297 Md. 1, 464 A.2d 1065 (1983); *State v. Metscher,* 297 Md. 368, 464 A.2d 1052 (1983); and *Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

Four years later, in *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), the Supreme Court held that such a *per se* exclusion could not Constitutionally be applied to preclude the defendant in a criminal case from testifying on

his or her own behalf. The question now before us is whether that Constitutionally-based exception to a *per se* exclusion applies as well to the testimony of a defense witness other than the defendant. We shall respond in the negative.

## THE FACTS

Early on the morning of February 27, 1989, the body of Jeffrey Fiddler (whom, to distinguish him from his brother, Jimmy, we shall refer to as Jeffrey) was discovered in a ditch adjacent to an entrance ramp to Interstate 81 in Pennsylvania, just over the Pennsylvania–Maryland border. An autopsy revealed two stab wounds—one to the chest and one in the back—a number of defense wounds to the hands, bruises to the back of the neck, and abrasions and contusions in the lower back and buttocks region. The medical examiner determined that the bruises, abrasions, and contusions were inflicted before death and that the cause of death was the eight-inch stab wound to the chest, which perforated a lung. He opined that the chest wound engendered extensive bleeding, that it would have caused large pools of blood at the crime scene, and that death would have ensued within a half hour after the stabbing. Based in part on the fact that there was very little blood in the ravine where the body was found, the Pennsylvania police determined that the stabbing had occurred elsewhere and that the body had been moved after death. When the body was discovered, Jeffrey had on no underwear or socks, but was wearing a shirt, blue jeans, and shoes. Blood patterns on those items and on the body itself indicated that Jeffrey was not wearing the blue jeans or the shoes when he was stabbed.

After a preliminary investigation, the authorities concluded that the crime had probably been committed in Maryland, and the Hagerstown police promptly began assisting the Pennsylvania State Police. The police interviewed a number of people who knew Jeffrey—petitioner Burral, Robert Schell, Edward Stouffer, Jeffrey's brother, Jimmy Fiddler, and some of their respective wives or girlfriends. The stories told by these people, at various times, were not always clear and not always

consistent, either internally or with each other, and approximately six years elapsed before the police determined that they had sufficient evidence to charge Burral and Stouffer with the murder. The investigation was actually suspended for about four years, between 1990 and 1994. There was evidence that Jeffrey was stabbed in Hagerstown, in or just outside of Schell's apartment at 12 Elizabeth Street, and there was other evidence, coming largely from statements made by Burral, that the stabbing occurred in other places—in Clear Spring, Maryland, some 10 miles west of Hagerstown, or in Williamsport, which is on the West Virginia border. There were accusations that Schell did the stabbing, that Edward Stouffer was the killer, and even that Jimmy Fiddler was the culprit.

Based, in part, on statements given to the police by Burral in March, 1989, suspicion focused initially on Schell, and, in August, 1989, he was arrested and his apartment was searched.[1] When Jimmy Fiddler exonerated Schell, however,

---

1. In March, 1989, Burral was interviewed by Trooper Paul and Trooper Black, of the Pennsylvania State Police, and Detective Johnson, of the Hagerstown police. He gave them two statements, both accusing Schell of having committed the murder. In the first statement, Burral said that he had seen Jeffrey in the back seat of a blue Mercury Lynx some time between 2:00 and 3:30 on the morning that he was killed and that Schell and two men from Washington, D.C. were also in the car. He accused Schell of having stabbed Jeffrey with a "sword" that Schell kept in his home. He was informed that the killing had occurred at the Williamsport river bottom and that it resulted from a drug debt—Jeffrey owed Schell about $1,000. Burral told the police that he saw Schell later, around 6:30 in the morning, and assumed that Jeffrey's body had been dumped before then. Burral denied any participation in the event, claiming that he had just returned to Hagerstown.

In the second statement, Burral recounted that he was at Schell's house with Schell and Jeffrey on the evening of February 26, that Schell and Jeffrey got into an argument about a debt, and that Schell stabbed Jeffrey with a knife that Burral had recently given Schell. Burral then left the house. He next saw Schell around 2:30 the next morning. He, Schell, and one other person drove to Exit 1 on Interstate 81, where, at Schell's direction, Burral stopped the car and turned off the lights. Schell said that he had to get rid of something; he left the car and then returned.

he was released and Burral was charged with having given the police a false statement. Burral soon left Maryland for Florida. The investigation continued. By May, 1990, the police apparently came to believe that Burral had more knowledge about the incident than he had previously revealed, and they took the unusual step of seeking and obtaining his extradition on the outstanding false statement charge, which was only a misdemeanor. In a statement given to the Florida police upon his arrest, Burral admitted that he accused Schell because he had a grudge against him. Nonetheless, though no longer accusing Schell of having committed the murder himself, he asserted that Schell probably paid someone to do it. He claimed that he never knew Jeffrey and did not know what happened on the night Jeffrey was killed. In a statement given to the Hagerstown police several days later, Burral changed his story. He claimed that he and Willie Stouffer, Edward Stouffer's brother, went to Clear Spring, where they were soon joined by Edward Stouffer and Jeffrey. Edward Stouffer and Jeffrey got into an argument over money that Jimmy allegedly owed Edward and Willie for drugs, and, when Jeffrey walked away, Edward went after him, fell on top of him, and stabbed him. Edward then put the body in the trunk of the car. When the car could not be started, Edward and Burral pushed the car down the hill to Willie Stouffer's girlfriend's house, where Edward told his brother that the body was in the car and to do "whatever was necessary." Willie's girlfriend then drove Burral and Edward back to Hagerstown. Burral said that he made the accusation against Schell at Edward's request.

Burral was arrested for the murder in September, 1995. The State's theory at trial was that Burral, Schell, Edward Stouffer, and others were engaged in some criminal activity emanating from Rocky's Pizza, that Jeffrey was associated with some of the group but was essentially an outsider, and

---

The search of Schell's house did disclose some incriminating evidence, including blood stains, a sock with possible blood on it, and a bank card with Jeffrey's name on it.

that they were concerned that he may be talking to the police and could not be trusted. The State posited, and produced evidence to show, that Jeffrey was kidnapped and beaten, that he was stabbed by Edward Stouffer with a knife supplied by Burral, that he was then put into a car, and that Stouffer and Burral then drove the car through Hagerstown to the Interstate 81 entrance ramp, where they dumped the body.[2]

Burral does not challenge the sufficiency of the State's evidence. In addition to Burral's own statements given to the police, the State produced Rebekah Knodle, who testified that she, Edward Stouffer, and Burral were at the apartment of one Jimmy Russell on the evening before Jeffrey's body was found, that Russell, Stouffer, and Burral left the apartment around 4:30 p.m. and returned about 3:30 the next morning. Burral had a red substance on his pants and shoes which he claimed was either red mud or the result of a nosebleed. He changed his clothes and put the clothes that he previously had on in a plastic bag. Those clothes were never recovered. After being shown her pre-trial statement to the police, Ms. Knodle said that Burral "might have" told her that the killing took place on Elizabeth Street.[3] Angela Tobery testified that Burral had told her that he was present when Edward Stouffer stabbed Jeffrey, that the knife used in the killing belonged to Burral, and that Burral, at one point, was sitting on top of Jeffrey on the back seat of the car as it traveled through Hagerstown. That, he told Ms. Tobery, is how he came to have blood all over him. Barbara Kelly testified that, the evening before Jeffrey's body was found, she saw Jeffrey near Rocky's Pizza running across the street, being chased by

---

2. In a separate trial, Stouffer was convicted of kidnapping and felony murder for his part in the enterprise. We affirmed those convictions in *State v. Stouffer*, 352 Md. 97, 721 A.2d 207 (1998).

3. Ms. Knodle also testified that, when the police came to the door shortly after Burral and Eddie Stouffer returned and informed them of Jeffrey's death, Burral told the police that "he did it, he was there and he used his knife that he carried on his, his belt, to do it." She said that it made no sense to her that the police released Burral after holding him for only a few hours.

several men, among whom were Edward Stouffer and Burral. She heard Stouffer warning Jeffrey to stay away from "Becky."

The testimony, or proffered testimony, that produced the issue before us came from Lisa Wallech, who had been Jeffrey's girlfriend at the time he was killed. Ms. Wallech was called as a defense witness, in an apparent attempt to focus suspicion back on Robert Schell. To put the issue in perspective, Jimmy Fiddler testified, as a State's witness, that, on the evening his brother was killed, Jimmy, Schell, and several others, including Ms. Wallech, were together at Schell's home at 12 Elizabeth Street. He and Schell went out for a while. Jimmy returned around 2:30 a.m., and Schell returned around 4:00. Just after Schell returned, Jimmy and Schell got into an argument. Schell, apparently, had been in several arguments that evening. Jimmy attempted to leave, but Schell followed him, and the two got into a wrestling match in front of the house. Jimmy stated that his brother, Jeffrey, was not there that evening and had not gotten into any fight with Schell. Schell confirmed Jimmy's account, adding that, prior to their altercation, Melissa Bishop, who was also at the house, had hurt her back, that an ambulance was called, and that his fight with Jimmy occurred outside, in front of the ambulance. This evidence tended to exculpate Schell, as it gave him at least a partial alibi.

Lisa Wallech was interviewed by the police during the early stages of the investigation. On August 25, 1989, she gave a written statement to Detective Johnson generally confirming the account given by Schell and Jimmy Fiddler. Lisa acknowledged that she, Melissa, Schell, and Jimmy, along with a few other people, were at Schell's apartment "partying" and drinking from about 7:30 in the evening. Jeffrey, she said, was not present at any time that evening. Lisa continued that, after Melissa hurt her back, she (Lisa) left to call Melissa's parents. When she returned, "Jimmy and Bobby was outside fighting." She put the time at "2:30 or 3:00. Somewhere right around in there." At the time she gave that statement, Schell was a prime suspect—as noted, based in

part on Burral's statements a week earlier, Schell had been arrested and his house searched—and she was asked repeatedly whether she was "sure this fight was between Jimmy and Bobby and not between Bobby and Jeff," to which she replied, "No it was Jimmy and Bobby" and "I can almost swear it." Detective Johnson kept pressing her on that point, and she continued to claim that she was "almost positive" that the fight was with Jimmy, not Jeffrey. Johnson obviously was not convinced, so he arranged for Ms. Wallech to be hypnotized. She stated that "they [Detective Johnson and Pennsylvania State Trooper Paul] thought I had an involvement in it and I know that there was something that I knew but I didn't, I couldn't bring it out, I was blockin' it out, so they asked me to go under hypnosis."

The hypnosis session occurred on September 15, 1989. It was conducted by Maryland State Police Sergeant Dan Seiler, who signed his report as "Investigative Hypnotist." The record does not reveal Sergeant Seiler's credentials, training, or experience. His report recites the purpose of the session as being to determine whether Ms. Wallech "could remember any additional details regarding the evening of 2–26–89 to 2–27–89," noting that "[s]he was drinking that night of the murder and she is having trouble remembering details of the events that occurred the night of the murder." Sergeant Seiler stated that, in a pre-hypnosis interview, Ms. Wallech told him "the same thing he/she related to the case investigator," but that, during the light trance he succeeded in inducing, "several additional details were obtained." [4] One of those details was Ms. Wallech's new recollection, recorded the next day in a written question and answer statement given to Detective Johnson, that the fight she saw in front of 12 Elizabeth Street was between Schell and *Jeffrey*, not Schell

---

4. The session was videotaped, but the tape was not offered into evidence. At Burral's request, it was marked for identification and was transmitted to this Court as an exhibit neither offered nor admitted. We have viewed the tape and, although its contents play no part in our decision, we note some observations about the procedure in note 10, *infra*.

and *Jimmy.* She was then "positive" that it was Jeffrey, not Jimmy, because "I seen it with my eyes." More significant, perhaps, was her new recollection that the fight was not just a wrestling match or fistfight: she purported to recall seeing Schell hit Jeffrey with a knife and seeing Jeffrey's back and hands "slashed." The blade, she said, was about eight inches long and there was green tape around the handle. She acknowledged that she had consumed "at least 12 to 13 beers" that evening and was unable, prior to the hypnosis, to remember the fight because she was under the influence of alcohol. Before the hypnosis, Ms. Wallech believed that Jimmy Fiddler had killed his brother; afterward, she came to believe that Schell was the killer.

When Burral called Ms. Wallech as a witness, the State objected, on the basis of *Collins,* to any testimony beyond what she had told the police prior to the hypnosis. To establish that, she was called outside the presence of the jury. She recounted that she had consistently told the police that the fight she saw was between Schell and Jimmy Fiddler "until I went under hypnosis and then it, it came to me that it was Jeff." She confirmed that, until then, she had no recollection that Jimmy was not the participant, and that there was nothing other than the hypnosis to "bring this back to memory that it was someone else beside Jimmy." Her actual memory at trial, which occurred nearly seven years after her hypnotic session, was uncertain; she was not entirely sure whether it was Jimmy or Jeff:

"Q. Okay, and the fight, what do you remember about the fight as a result of hypnosis?

A. I remember Bobby bein' hunched over, *whoever's body it was there* and they was comin' down like, like a stabbing motion.

Q. That's Jeffrey Fiddler's body?

A. *I can't be honest with that, I don't know if it was Jimmy or Jeff.*"

(Emphasis added.)

Ms. Wallech identified the August 25, 1989 pre-hypnosis statement she had given to the police and confirmed that it

accurately recorded what she had said at the time. She also identified the post-hypnosis statement given on September 16, 1989. After hearing argument, the court determined that Ms. Wallech's memory as to who was fighting with Schell was inextricably tied to the hypnosis and that any testimony as to that matter would therefore be inadmissible. Counsel was directed not to question Ms. Wallech about the fight she claimed to have seen on Elizabeth Street.

In her testimony given to the jury, Ms. Wallech said that, about a week before the murder, she overheard Schell and Edward Stouffer talking about teaching Jeffrey "a lesson," because they were afraid that he would reveal to the police the drug activity with which they were involved. They "wanted to put a scare into him." Burral, she said, was not part of that conversation. Ms. Wallech did not tell Jeffrey about that conversation because she did not take the threat seriously. In conformance with the court's ruling, she was not asked about any of her statements to the police or about the fight on Elizabeth Street.

Upon the evidence presented, Burral was convicted of second degree murder and sentenced to imprisonment for 30 years. The Court of Special Appeals affirmed that judgment, *Burral v. State*, 118 Md.App. 288, 702 A.2d 781 (1997), and we granted *certiorari* to consider the one issue of whether the court erred in sustaining the State's objection to Ms. Wallech's testifying with respect to the fight on Elizabeth Street.

## DISCUSSION

### State v. Collins and the Hypnosis Landscape

The admissibility of testimony based on hypnotically-enhanced recollections or memory first came before this Court in *State v. Collins, supra,* 296 Md. 670, 464 A.2d 1028. At issue was the testimony of a State's witness, Alfred Davis. Davis informed the police that Olivia Collins had been shot by her husband at a truck stop and then driven away. After her body was discovered in her car in the Pocomoke River, the victim's husband was charged with the murder. At trial,

Davis testified that he was not in Ms. Collins's car at the time of the shooting. The jury was unable to agree upon a verdict, so a mistrial was declared and Collins was retried. Prior to the second trial, Davis was hypnotized, and, as a result of the hypnosis, he was able to recall that he was, in fact, in the victim's car. He was allowed to testify at the second trial that another car, which Ms. Collins told him was her husband's, pulled beside Ms. Collins's car, that a man got out of that car and ordered him out of "his wife's car," that an argument ensued, that the man obtained a rifle from his car and shot Ms. Collins, that Davis then ran for assistance, and that, as he returned, he saw a man get into Ms. Collins's car and drive away. He attributed the different recollection entirely to the hypnosis. With that new evidence, the jury convicted Collins of first degree murder. The Court of Special Appeals reversed, holding that the hypnotically-induced testimony was inadmissible. We agreed with that conclusion, though for different reasons than assigned by the intermediate appellate court.

*Collins* was decided by us in 1983—before we codified our rules of evidence in general conformance with the Federal Rules of Evidence and before the Supreme Court decided *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). At the time, the prevailing rule governing the admissibility of expert opinion evidence based on scientific technique was that enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923): that kind of evidence was inadmissible unless the scientific technique was generally accepted as reliable in the relevant scientific community. We had generally adopted that standard in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), and we commenced our discussion in *Collins* by adopting it specifically "as the basis for evaluation of testimony where a witness has been hypnotized," noting that most courts had adopted that standard with respect to testimony based on hypnotically-enhanced memory. 296 Md. at 681, 464 A.2d at 1034.

We observed in *Collins* that, while the courts seemed to agree that testimony given while a witness is actually in a

hypnotic trance and evidence of what a witness said while in such a trance are inadmissible (*see Rault v. Butler*, 826 F.2d 299 (5th Cir.1987); *People v. Blair*, 25 Cal.3d 640, 159 Cal. Rptr. 818, 602 P.2d 738 (Cal.1979); *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (Va.1974)), four different positions had been taken with respect to testimony based on hypnotically-enhanced memory.[5] Courts have held (1) that the fact that a witness's memory was hypnotically enhanced goes only to the weight or credibility of the testimony based on that enhancement, not to its admissibility; (2) that because hypnosis has not been generally accepted within the relevant scientific community as producing a reliably accurate recollection and, indeed, may serve to distort one's memory, a witness who has undergone hypnosis may not testify with respect to any matter discussed during hypnosis; (3) that testimony based on hypnotically-enhanced recollections is admissible if certain specified safeguards were employed to assure that the testimony was not improperly influenced by the hypnosis; and (4) that, because hypnosis as a memory-enhancing technique is not generally accepted within the scientific community, testimony based on hypnotically-enhanced memory is inadmissible, but that does not preclude the admission of testimony based on and consistent with the witness's recollections recorded prior to the hypnosis.

The four approaches in vogue when *Collins* was decided evolved over time. The first approach noted in *Collins* was inaugurated by the decision of the Court of Special Appeals in *Harding v. State*, 5 Md.App. 230, 246 A.2d 302, *cert. denied* 252 Md. 731, *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23

---

5. The preclusion of statements made while the witness is under a hypnotic trance arises from the concern that, in that setting, the hypnosis is proffered as a truth elicitor, much like alleged truth sera, rather than as simply a memory enhancer. Conversely, the rules adopted with respect to testimony based on hypnotically enhanced memory have not been applied to render incompetent a witness who had been hypnotized for reasons other than enhancing memory. *See, for example, People v. McKeehan*, 732 P.2d 1238 (Colo.App.1986), *cert. denied*, 753 P.2d 243 (witness competent to testify after being hypnotized for purpose of relaxation).

L.Ed.2d 468 (1969). In *Harding,* the victim of a rape and shooting was unable to remember many of the details of the attack on her until she was hypnotized by a psychologist employed by a State hospital. After extensive testimony by the hypnotist as to his qualifications and the procedure used, the victim was permitted to testify as to her current recollection. *Harding* was decided before this Court adopted the *Frye* standard for evaluating evidence based on novel scientific techniques, and the Court of Special Appeals therefore had no occasion to subject hypnosis to that standard. Noting only that "medical science has now recognized the possibility that memory of painful events can sometimes be restored by hypnosis, although some authorities warn that fancy can be mingled with fact in some cases," the court concluded that the fact that some of the victim's testimony was based on the hypnotically-enhanced recollections went only to the weight of the testimony. The court did observe, and obviously found comfort in the facts, that the hypnosis procedure was explained to the jury, that the hypnotist was competent, and that much of the victim's testimony was corroborated by other evidence.

A number of courts quickly followed the *Harding* approach, especially when the challenged testimony was that of a crime victim apparently traumatized by the event. *See* discussion in *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (N.Y.1983) and *People v. Shirley,* 641 P.2d 775 (Cal.1982), subsequent opinion upon reconsideration, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354, *cert. denied,* 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 and 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 383 (1979). Cases in this category regard the challenged testimony as still being based on the witness's actual current recollection, notwithstanding that the recollection was enhanced through hypnosis. Some courts have analogized it to testimony refreshed or revived by more traditional methods, such as reviewing a particular document. *See Kline v. Ford Motor Co., Inc.,* 523 F.2d 1067, 1070 (9th Cir.1975);

*Clark v. State,* 379 So.2d 372 (Fla.App.1979). The earlier opinions in this category did not treat hypnosis as a scientific technique subject to the foundational requirements of *Frye,* or any comparable standard, although in some instances the court noted the need for some form of assurance that the testimony in question was reliable, ranging from simply informing the jury that the witness had been hypnotized (*United States v. Miller,* 411 F.2d 825 (2d Cir.1969)) to evidence describing the process of hypnosis, attesting to the competence of the hypnotist, negating improper suggestiveness, and otherwise supporting the reliability of the post-hypnosis testimony. *See Harding, supra,* and *People v. Smrekar,* 68 Ill. App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (Ill.App.1979).

After a decade or so of success, the *Harding* approach came under greater scrutiny and was increasingly rejected, as the psychology of memory and the theory and practice of hypnosis in a forensic setting became better understood, in part as the result of greater attention being given to those matters in the scientific literature and in part through more extensive expert testimony in cases where previously hypnotized witnesses were called to testify. The principal basis for the rejection of a liberal admissibility approach was the recognition that hypnosis was, indeed, a scientific technique that should be subjected to the *Frye* standard. The other three approaches as to admissibility emanated, essentially, from differing views as to whether hypnosis, as a memory enhancer, satisfied or could be made to satisfy that standard. In that regard, the courts referred most frequently to the writings of four authors: Bernard L. Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 CALIF. L.REV. 313 (1980); Martin Orne, THE USE AND MISUSE OF HYPNOSIS IN COURT, XXVII, No. 4, INT. J. CLINICAL & EXPERIMENTAL HYPNOSIS 311 (1979); Martin Reiser, HANDBOOK OF INVESTIGATIVE HYPNOSIS [Nov.1976] The Police Chief 36; HYPNOSIS AS AN AID IN A HOMICIDE INVESTIGATION, 17 Am. J. Clinical Hypnosis 84 (1974); and Elizabeth Loftus, ON THE PERMANENCE OF STORED INFORMATION IN THE HUMAN BRAIN, 35 Am. Psychologist 409 (1980); EYEWITNESS TESTIMONY (1980).

The second approach noted in *Collins* was initially articulated in *State v. Mack*, 292 N.W.2d 764 (Minn.1980) and *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (Ariz.1981), but the case most often referred to as typifying the second approach is *People v. Shirley, supra,* 641 P.2d 775 (Cal.1982), *modified, on reconsideration,* 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982). In a *tour de force* opinion by Justice Mosk, the *Shirley* court rejected as unfounded Reiser's notion that human memory is like a videotape machine that faithfully records and permanently stores every perception experienced by the witness, subject to accurate replay under hypnosis. It accepted instead the predominant view in the literature that hypnosis is a process of suggestion, that the subject becomes highly receptive to suggestions perceived as coming from the hypnotist, that the subject experiences a compelling desire to please the hypnotist by reacting positively to those suggestions, that the subject will thus produce a memory that may consist of relevant actual facts, irrelevant actual facts, fantasized material, and conscious lies—"all formulated in as realistic a fashion as he can"—and that the subject develops a heightened confidence in that potentially flawed memory that makes effective cross-examination especially difficult. *Shirley,* 181 Cal.Rptr. 243, 723 P.2d at 1382–83. During the hypnotic session, the court concluded, neither the subject nor the hypnotist can distinguish between true memories and pseudo-memories of various kinds in the reported recall. From the literature, and most particularly from the views of Professor Diamond, the court found that the use of hypnosis to restore memory was not only not generally accepted, but was, in fact, opposed in the relevant scientific community, and that it therefore did not satisfy the *Frye* standard. Accordingly, the court held that the testimony of a witness who has undergone hypnosis for the purpose of restoring memory of the events in issue "is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward." *Id.,* 181 Cal.Rptr. 243, 723 P.2d at 1384. *See also State v. Davis,* 490 A.2d 601 (Del.Super.1985); *cf. Com. v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981).

The third approach, of allowing testimony based on hypnotically-enhanced memory if certain specified safeguards are followed, emanated principally from *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (N.J.1981) which, like most of the cases, involved a crime victim whose memory had been enhanced through hypnosis. The trial court indicated that it would allow the testimony if the State could prove that it had complied with six specific safeguards recommended by Dr. Orne, who testified as a defense expert in the case, but eventually ruled the testimony inadmissible after finding that the State had not complied with those standards.[6] The New Jersey Supreme Court affirmed both the approach and the judgment of the trial court. The court held, preliminarily, that hypnosis, when used to refresh recollections, was a scientific technique that must satisfy the New Jersey alternative to *Frye*—*i.e.,* it must have a sufficient scientific basis to produce uniform and reliable results and contribute materially to the ascertainment of truth. General acceptance within the relevant scientific community, in other words, was not the test that the *Hurd* court applied.

The court noted the same concerns about hypnotically-enhanced memory that were addressed in *Shirley*—that hypnosis is "prone to yield sheer fantasy, willful lies, or a mixture of fact with gaps filled in by fantasy" (*id.,* 432 A.2d at 92), that the subject is vulnerable to suggestion and will tend to shape his or her recall in response to even inadvertent clues from the questioner, that a person under hypnosis is more willing to speculate and will respond to questions with a confidence that he or she would not otherwise have as a waking person, and, most troubling to the court, the tendency "to confound memories evoked under hypnosis with prior recall." *Id.,* 432 A.2d at 93. Nonetheless, the court determined that a *per se* rule of inadmissibility was unnecessarily broad and might result in the exclusion of evidence at least as trustworthy as other

---

6. The standards apparently testified to by Dr. Orne were set out in his article, THE USE AND MISUSE OF HYPNOSIS IN COURT, 27 Int. J. Clinical & Experimental Hypnosis, 311, 335–36 (1979).

eyewitness testimony (which, the court observed, has similar shortcomings). Indeed, the basis of the court's middle-ground approach was its conclusion, based on expert testimony in the case, that "the use of hypnosis to refresh memory is comparable in reliability to ordinary recall." *Id.*, 432 A.2d at 95. It concluded that testimony enhanced through hypnosis was admissible in a criminal trial "if the trial court finds that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." *Id.*, 432 A.2d at 95.

The *Hurd* court did not stop with that general statement but instead proceeded to set forth certain conditions that the proponent of the testimony, by clear and convincing evidence, must establish were satisfied in order for a court to make the requisite determination. First, the party seeking to call the hypnotized witness must inform the other side of that intent and provide him or her with a recording of the hypnosis session "and other pertinent material." *Id.*, 432 A.2d at 95. The court would then, outside the presence of the jury, determine whether the evidence is admissible, evaluating "both the kind of memory loss that hypnosis was used to restore and the specific technique employed." *Id.* The object of that review is not to determine whether the proffered testimony is accurate, but whether the use of hypnosis and the procedure followed constituted a reasonably reliable means of restoring the witness's memory.

In that regard, the court would be required first to consider the appropriateness of using hypnosis for the kind of memory loss encountered—to restore a memory loss that was pathological in nature, such as traumatic neurosis, or simply to verify details or conflicting accounts—and whether the witness had some discernible motivation for not recalling a particular version of the event. If the court were to find hypnosis appropriate, it would then determine whether the procedures used ensure a minimum level of reliability. No determination of reliability could be made, however, unless six procedural requirements recommended by Dr. Orne were satisfied: (1) a psychologist or psychiatrist experienced in the use of hypnosis

must conduct the session; (2) that person must be independent of the prosecution, the investigator, and the defense; (3) any information given to the hypnotist prior to the session must be recorded; (4) before inducing hypnosis, the hypnotist must obtain from the subject a detailed description of the facts as the subject remembers them; (5) all contacts between the hypnotist and the subject must be recorded; and (6) only the hypnotist and the subject may be present during the hypnotic session or any pre-hypnotic testing or post-hypnotic interview.

A number of courts adopted the *Hurd* approach, occasionally with some modifications. *See State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (N.M.App.1981); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386 (1983); *Brown v. State,* 426 So.2d 76 (Fla.App.1983); *cf. State v. Long,* 32 Wash.App. 732, 649 P.2d 845 (1982).

The fourth approach was well-articulated in *State ex rel. Collins v. Superior Court, Etc.,* 132 Ariz. 180, 644 P.2d 1266 (1982), *opinion on reconsideration.* In *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981), the Arizona Supreme Court, after an exhaustive review of the literature and the various cases, expressed deep concern about testimony based on hypnotically-enhanced memory. Adopting the view of Professor Diamond that "once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify," *id.,* 624 P.2d at 1277, quoting Diamond, *supra, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 CALIF. L.REV. 313, 314 (1980), the *Mena* court held that, until hypnosis gained general acceptance in the fields of medicine and psychiatry as a method by which memories could be improved without undue danger of distortion, delusion, and fantasy, the testimony of witnesses "tainted by hypnosis" was inadmissible in criminal cases. *Id.,* 624 P.2d at 1279. Noting the difficulty in determining whether proffered testimony is the product of hypnosis or the witness's own untainted memory, the court took the cautionary approach of "consider[ing] testimony from witnesses who have been questioned under hypnosis regarding the subject of

their offered testimony to be inadmissible in criminal trials from the time of the hypnotic session forward." *Id.,* 624 P.2d at 1280. *Mena* was relied upon by the *Shirley* court as one of the cases formulating the second approach.

The Arizona court reconsidered that approach in *Collins.* It confirmed its view that the *Frye* test was applicable to hypnotically-induced recall testimony and that hypnosis had not received sufficient acceptance in the scientific community to give reasonable assurance of reliability. The court abandoned the *Mena* approach, however, as it might effectively preclude the police from using hypnosis for investigative purposes, which the court was unwilling to do. Under a *Mena/Shirley* approach, the police faced a real Hobson's choice, especially with respect to traumatized victims of rapes, shootings, serious assaults, and robberies. If, to assist an investigation, the police placed a person under hypnosis, they risked rendering that person incompetent as a witness, which could leave the State without a case.[7] The Arizona court in *Collins* was unwilling to adopt the *Hurd* approach, however, concluding not only that the proffered safeguards would not suffice to assure reliability but that their application would inordinately consume judicial resources. It agreed with the Michigan court in *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (1981) that, although the *Hurd* standards might minimize distortion due to suggestibility, they might also give hypnosis an unwarranted aura of reliability, and predicted that "the case-by-case determination under a set of safeguards will consume too much in the way of judicial resources, will produce conflicting results in different trial courts, and will produce few situations in which hypnotic recall testimony is ever admitted." *Collins,* 644 P.2d at 1294.

Having rejected the *Harding, Hurd,* and *Shirley* approaches, the court centered on what became the fourth

---

**7.** In that regard, the court declared that there was no valid public policy "for not allowing a rape victim to testify to the fact of rape even though she was subsequently hypnotized for the purpose of providing identifying 'facts' which, after verification, might lead the police to apprehension of the criminal." *Collins, supra,* 644 P.2d at 1295.

approach—that hypnosis does not render the witness incompetent to testify to those facts demonstrably recalled prior to hypnosis. The court retained its concern that hypnosis might affect the reliability of the witness's purported pre-hypnotic recollections, and therefore required (1) that, prior to subjecting the person to hypnosis, the party record the substance of that witness's knowledge and recollections, so that the pre-hypnotic recall can be established, and (2) that the party assure that the hypnosis procedure is performed in a manner designed "to minimize the danger of contamination of both prehypnotic and posthypnotic recall." *Id.*, 644 P.2d at 1296.

The fourth approach was adopted as well in *Contreras v. State*, 718 P.2d 129 (Alaska 1986); *Elliotte v. State*, 515 A.2d 677 (Del.1986); *Bundy v. State*, 471 So.2d 9 (Fla.1985); *State v. Moreno*, 68 Haw. 233, 709 P.2d 103 (1985); *State v. Wren*, *supra*, 425 So.2d 756; *Com. v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983); *Com. v. Kater*, 409 Mass. 433, 567 N.E.2d 885 (1991); *People v. Lee*, 434 Mich. 59, 450 N.W.2d 883 (1990); *People v. Hughes*, *supra*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484; *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984); and *Com. v. Taylor*, 294 Pa.Super. 171, 439 A.2d 805 (1982).

We examined these four approaches, as well as the relevant writings of Professor Diamond and Dr. Orne, in our *Collins*. As noted, we rejected the first approach because it gave no recognition to *Frye/Reed*, which we held to be the controlling standard. Indeed, the Court of Special Appeals itself, which had inaugurated that approach in *Harding*, abandoned it after we embraced the *Frye* standard in *Reed v. State*. *See Polk v. State*, 48 Md.App. 382, 427 A.2d 1041 (1981). We specifically declined to follow *Hurd*, largely for the reasons cited in *Shirley*, which tracked some of the reasons given by the Arizona court in its *Collins*—that the *Hurd* standards could not be trusted to assure that hypnotically-enhanced recollections were reliable and that requiring strict compliance with those standards would inject undue delay, confusion, and endless squabbles into the judicial process. As stated in *Shirley*, "the game is not worth the candle." *Collins*, 296 Md.

at 702, 464 A.2d at 1044, quoting the initial opinion in *Shirley,* 641 P.2d at 787; *also* 181 Cal.Rptr. 243, 723 P.2d at 1366, *modified, on reconsideration.* We also rejected the *Shirley* approach of rendering a hypnotized witness incompetent to testify as to any matter discussed under hypnosis, although we did so only tacitly, through our adoption of the fourth approach. Although we concluded that hypnotically-enhanced testimony did not satisfy the *Frye/Reed* test, we saw no reason "why a person should not be permitted to testify in court in accord with statements which it clearly can be demonstrated he made prior to hypnosis." *Collins,* 296 Md. at 702, 464 A.2d at 1044. That testimony, we noted, "is not then hypnotically enhanced testimony." *Id.* We did not attempt to set forth any particular procedure for ascertaining which statements were made prior to a hypnotic session.

In *Collins,* we reversed the conviction because the testimony of Mr. Davis was based on hypnotically-enhanced recollections and was therefore inadmissible. We decided three other cases that same day involving the same issue. In *Simkus v. State, supra,* 296 Md. 718, 464 A.2d 1055, we applied the *Collins* rationale but ruled that the challenged identification testimony of a previously hypnotized witness was admissible because the record clearly demonstrated that it was based on her pre-hypnotic observations and recollections. Prior to being hypnotized, she had given a detailed description of Simkus to the police, assisted a police artist in preparing a sketch, and identified Simkus's photograph. *See also McCoy v. State,* 301 Md. 666, 484 A.2d 624 (1984), reaching the same result with respect to Simkus's co-defendant. In *Grimes v. State,* 297 Md. 1, 464 A.2d 1065 (1983), we reversed a conviction because the testifying victim was unable to remember anything until undergoing hypnosis; her testimony as to criminal agency was based entirely on hypnotically-enhanced memory. In *State v. Metscher,* 297 Md. 368, 464 A.2d 1052 (1983), it was not clear how much of the victim's testimony was based solely on pre-hypnotic recollections. We reversed because the record did not demonstrate that her testimony was in accordance with pre-hypnotic statements.

After *Collins* was decided, a number of courts developed a fifth approach. In *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (Idaho 1984), the Idaho court viewed the issue as one of witness competence and, citing Federal Rule of Evidence 601, noted that the modern trend was to regard all witnesses as competent, subject to only a few *per se* exceptions. That evolution, it said, was based on the premise that *per se* rules that disqualify witnesses with relevant knowledge obstruct the ascertainment of truth. On the other hand, the court recognized the various concerns about hypnotically-enhanced memory that had been addressed in the literature and the cases, and it noted the several approaches that had been taken. The Idaho court regarded all of those approaches as *per se* rules—precluding admission, allowing admission, or, as in *Hurd*, allowing admission if certain safeguards were present—and, in conformance with its distaste for *per se* rules, rejected all three in favor of what it termed a "totality of the circumstances" test. Trial judges would be required to conduct a pretrial hearing on the procedures used during the hypnotic session and then determine "whether, in view of all of the circumstances, the proposed testimony is sufficiently reliable to merit admission." *Id.*, 682 P.2d at 578. If "the witness's memory seems to have been altered in such a way as to render it unreliable, the trial court may rule the witness to be incompetent." *Id.* As additional safeguards, the court adopted a modified version of the Orne safeguards.

Relying on *Iwakiri*, the Colorado Supreme Court adopted a totality approach in *People v. Romero*, 745 P.2d 1003 (Colo. 1987). Trial courts, it said, must make an "individualized inquiry" in each case to determine whether the trial testimony of a previously hypnotized witness was reliable, the proponent of the testimony having the burden to establish reliability by a preponderance of the evidence. In determining admissibility, the court must consider the level of training of the hypnotist, the hypnotist's independence, documentation of the witness's memory and information given to the hypnotist prior to the hypnosis, recording of all contacts between the witness and the hypnotist, the circumstances under which the hypnosis

occurred, the appropriateness of using hypnosis for the kind of memory loss involved, and any corroborating evidence. If, upon all of those circumstances, the court finds "that the witness' recollection has not been so affected by the hypnosis as to render the witness' trial testimony unreliable, it may admit the testimony and may further permit the witness to be cross-examined on the fact and circumstances of the pretrial hypnosis as affecting the credibility and weight of the testimony." *Id.* at 1017.

Some U.S. Courts of Appeals appear to have adopted a totality approach, not as a matter of evidence law, but in determining, in a Federal habeas corpus proceeding, whether the *admission* of testimony by a State's witness whose memory had been enhanced through hypnosis deprived the defendant of his Sixth Amendment right of confrontation or his Fourteenth Amendment right to due process. *See Harker v. State,* 800 F.2d 437 (4th Cir.1986); *McQueen v. Garrison,* 814 F.2d 951 (4th Cir.1987); *Wicker v. McCotter,* 783 F.2d 487 (5th Cir.1986); *Bundy v. Dugger,* 850 F.2d 1402 (11th Cir.1988); *Robison v. Maynard,* 829 F.2d 1501 (10th Cir.1987). Those courts rejected the notions that (1) testimony of a State's witness who had been hypnotized had to be excluded because hypnosis so fixes the witness's memory as to make effective cross-examination impossible, and (2) the hypnosis also makes a subsequent identification so inherently unreliable as to deny the defendant due process of law.

### *Rock v. Arkansas*

Vickie Rock shot and killed her husband in the course of an argument and was, as a result, charged with manslaughter. Because she was unable to remember precise details of the shooting, at her attorney's suggestion, she underwent hypnosis, following which she was able to recall that, at the time of the shooting, she had her finger on the hammer of the gun but not on the trigger. She remembered as well that the gun discharged when her husband grabbed her arm. Upon that information, counsel arranged for an inspection of the gun, which revealed that the gun was defective and prone to fire

when hit or dropped, without the trigger's being pulled. The trial court declined to permit any hypnotically-refreshed testimony and limited Ms. Rock's testimony to matters remembered and stated to the hypnotist prior to being placed under hypnosis. It allowed the testimony of the gun expert. On appeal from her manslaughter conviction, Rock argued that the limitation on her testimony violated her Constitutional right to present a defense. Applying a *per se* exclusionary rule comparable to that adopted by us in *Collins,* the Arkansas Supreme Court affirmed the conviction. The Supreme Court reversed.

Rock's claim and the Supreme Court's ruling were "bottomed on her constitutional right to testify in her own defense." *Rock v. Arkansas, supra,* 483 U.S. at 49, 107 S.Ct. at 2704, 97 L.Ed.2d at 44. That right, the Court observed, "has sources in several provisions of the Constitution." *Id.* at 51, 107 S.Ct. 2704. Three such sources were identified. First, the Court held, it is "one of the rights that 'are essential to due process of law in a fair adversary process.'" *Id.* (citing *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562; *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); and *Ferguson v. Georgia,* 365 U.S. 570, 602, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961)). A second source identified by the Court—the one that has spawned the issue in this appeal—was "the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call 'witnesses in his favor.'" *Id.* at 52, 107 S.Ct. 2704. Logically included in that right, the Court noted, "is the right [of the defendant] to testify himself, should he decide it is in his favor to do so." *Id.* Continuing, the Court observed:

"In fact, the most important witness for the defense in many criminal cases is the defendant himself. There is no justification today for a rule that denies an accused the opportunity to offer his own testimony."

The Sixth Amendment, the Court said, grants to the defendant the right to make his or her defense—the right "to present his own version of events in his own words." *Id.* at 52, 107 S.Ct. 2704.

The third Constitutional source identified by the Court for the right to testify was a corollary to the Fifth Amendment guarantee against compelled testimony—the right to testify or not to testify. Quoting from *Harris v. New York*, 401 U.S. 222, 230, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court confirmed that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Id.* at 53, 107 S.Ct. 2704.

The issue before the Court was "whether a criminal defendant's right to testify may be restricted by a state rule that excludes her posthypnosis testimony." *Id.* Citing *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Court confirmed that a State "may not apply an *arbitrary* rule of competence to exclude a material defense witness from taking the stand" or "apply a rule of evidence that permits a witness to take the stand, but *arbitrarily* excludes material portions of his testimony." *Id.* at 55, 107 S.Ct. 2704 (emphasis added). Though acknowledging that the right to present relevant testimony "is not without limitation," the Court held that "restrictions *of a defendant's right to testify* may not be arbitrary or disproportionate to the purpose they are designed to serve" and that "[i]n applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed *on the defendant's constitutional right to testify.*" *Id.* at 55–56, 107 S.Ct. 2704 (emphasis added).

Turning to the issue before it, the Court characterized the *per se* rule applied by the Arkansas court as prohibiting the admission "of any defendant's hypnotically refreshed testimony on the ground that such testimony is always unreliable" and thus as operating "to the detriment of any defendant who undergoes hypnosis, without regard to the reasons for it, the circumstances under which it took place, or any independent verification it produced." *Id.* at 56, 107 S.Ct. 2704. In the particular case, application of that rule precluded Ms. Rock from describing any of the events that occurred on the day of the shooting or indeed of the actual shooting itself. Although

recognizing that the Arkansas approach followed that taken by a number of States, including Maryland, "that have decided that hypnotically enhanced testimony should be excluded at trial on the ground that it tends to be unreliable" (*id.* at 57, 107 S.Ct. 2704), the Court pointed out that the exclusionary rule in the other States was "for the testimony of *witnesses,* not for the testimony of a *defendant*"(*id.*), and found wanting Arkansas's failure "to perform the constitutional analysis that is necessary when a defendant's right to testify is at stake." *Id.* at 58, 107 S.Ct. 2704.

As a footnote to that statement, the Court noted that the Arkansas Supreme Court had relied on *Shirley* for much of its reasoning as to the unreliability of hypnosis, but pointed out that, although the California rule barring entirely the testimony of a witness who had been hypnotized was even more stringent than that of Arkansas, the California court explicitly excepted from that rule testimony by an accused.[8] The Court continued that "[t]his case does not involve the admissibility of testimony of previously hypnotized witnesses other than criminal defendants and we express no opinion on that issue." *Id.* at 58 n. 15, 107 S.Ct. 2704.

Although observing that hypnosis by trained physicians or psychologists has been recognized as a valid therapeutic technique, the Court acknowledged that the use of hypnosis in criminal investigations was "controversial" and that "the current medical and legal view of its appropriate role is unsettled." *Id.* at 59, 107 S.Ct. 2704. Citing the works of both Diamond and Orne, the Court, on the one hand, expressed an appreciation of the perceived problems with hypnosis as a memory enhancer but then, in stark contrast to the many

---

**8.** There was no such exception in the initial opinion in *Shirley.* On reconsideration, the California court added, as a caveat to its *per se* rule excluding the testimony of a previously hypnotized witness, that "when it is the defendant himself—not merely a defense witness—who submits to pretrial hypnosis, the experience will not render his testimony inadmissible if he elects to take the stand," noting, presciently, that the exception was to "avoid impairing the fundamental right of an accused to testify in his own behalf." 181 Cal.Rptr. 243, 723 P.2d at 1384.

courts that had determined otherwise (and without even taking account of those decisions), seemed to adopt as scientific fact Orne's position that "[t]he inaccuracies the processes introduces can be reduced, although perhaps not eliminated, by the use of procedural safeguards." *Id.* at 60, 107 S.Ct. 2704. Arkansas, it said, had not justified the exclusion "of *all* of a defendant's testimony that the defendant is unable to prove to be the product of prehypnosis memory." The "[w]holesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61, 107 S.Ct. 2704. Thus:

> "The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial."

*Id.*

*Rock v. Arkansas* was a five-to-four decision. The contrary view was expressed in a dissent filed by Chief Justice Rehnquist:

> "Like the Court today, the Arkansas Supreme Court observed that a hypnotized individual becomes subject to suggestion, is likely to confabulate, and experiences artificially increased confidence in both true and false memories following hypnosis. No known set of procedures, both courts agree, can insure against the inherently unreliable nature of such testimony. Having acceded to the factual premises of the Arkansas Supreme Court, the Court nevertheless concludes that a state trial court must attempt to make its own scientific assessment of reliability in each case it is confronted with a request for the admission of hypnotically induced testimony. I find no justification in the Constitution for such a ruling.

. . .

[U]ntil there is a much more general consensus on the use of hypnosis than there is now, the Constitution does not warrant this Court's mandating its own view of how to deal with the issue."
*Id.* at 62–65, 107 S.Ct. 2704.

### Effect of Rock v. Arkansas

The *Rock* Court very clearly carved out a Constitutional exception to any rule, whether one like *Shirley* or one like *Collins,* that *per se* precludes a defendant from testifying to relevant facts on the ground that his or her testimony is based on hypnotically-enhanced memory. Such testimony may be excluded upon a specific finding, based on an examination of the pertinent circumstances, that it is unreliable, but it may not be excluded on the general premise that all testimony based on hypnotically enhanced memory is always and inherently unreliable. Burral contends that the same principle necessarily applies with respect to other defense witnesses and is not limited just to the defendant. His contention is based on the Supreme Court's citation to *Chambers v. Mississippi, supra,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 and its mention of the Sixth Amendment right of a defendant to have compulsory process for obtaining witnesses in his favor as one of the sources of the supervening Constitutional right of a defendant to testify. It is "illogical," he argues, "to find the prohibition against a *per se* rule of exclusion applicable only to the testimony of the defendant himself." The State may continue to apply the *Collins* rule to State's witnesses and in civil cases if it chooses, he says, but it may not apply that rule to defense witnesses in criminal cases.

This question appears to be a matter of first impression. Although *Rock v. Arkansas* has been cited and applied in a number of cases since its filing, no court, to our knowledge, has yet to deal, except in *dicta,* with whether it serves to bar application of a *Collins*-type rule to other defense witnesses. When faced with a previously hypnotized defendant, some courts, following *Rock,* have adopted *Hurd*-type standards by

which to determine whether to allow the testimony. *See State v. Woodfin,* 539 So.2d 645 (La.App.1989); *Morgan v. State,* 537 So.2d 973 (Fla.1989) (expert opinion of defense psychiatrist as to defendant's criminal responsibility not inadmissible based, in part, on statements made by defendant while under hypnosis). The *Woodfin* court required that the defendant show, by clear and convincing evidence, the lack of suggestiveness and the reliability of the testimony in strict compliance with those standards. Some courts, citing *Rock,* have abandoned the *Collins* approach generally in favor of *Hurd*-type or other standards. *See State v. Butterworth,* 246 Kan. 541, 792 P.2d 1049 (1990); *Zani v. State,* 758 S.W.2d 233 (Tex.Cr.App. 1988), *aff'd on remand,* 767 S.W.2d 825 (Tex.App.1989); *Tumlinson v. State,* 757 S.W.2d 440 (Tex.App.1988). Other courts have maintained their view that such testimony is inadmissible (as to witnesses other than a defendant in a criminal case) and have not been persuaded by *Rock* to modify that position. *See State ex rel. Neely v. Sherrill,* 165 Ariz. 508, 799 P.2d 849 (1990); *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898 (1988); *Hall v. Com.,* 12 Va.App. 198, 403 S.E.2d 362 (1991); *People v. Zayas,* 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d 513 (1989). In 1984, based on a 1982 amendment to the California Constitution added by Proposition 8, the California legislature, in effect, overruled *Shirley* in favor of a modified *Collins* approach, permitting testimony by a previously hypnotized witness limited to matters that the witness recalled and related prior to the hypnosis if certain enumerated safeguards are met. *See* California Evidence Code § 795; *People v. Aguilar,* 218 Cal.App.3d 1556, 267 Cal.Rptr. 879 (1990); *People v. Burroughs,* 188 Cal.App.3d 1162, 233 Cal.Rptr. 872 (1987).

Notwithstanding the Constitutional exception carved out in *Rock,* the majority of courts still appear to use a *Collins* approach for witnesses other than the defendant. *See State v. Fertig,* 143 N.J. 115, 668 A.2d 1076 (1996), noting that, as of 1996, 26 States held hypnotically-refreshed testimony to be inadmissible *per se,* four States considered such testimony to be generally admissible, three States and a number of Federal

courts had adopted the totality of circumstances approach, and seven States, in addition to New Jersey, opted for *Hurd*-type standards by which to judge admissibility. *See also* Thomas M. Fleming, Annotation, *Admissibility of Hypnotically Refreshed or Enhanced Testimony*, 77 A.L.R.4th 927 (1990 and 1998 Supp.). The *Fertig* court, faced with the proffered testimony of a previously hypnotized State's witness, declined to abandon *Hurd.*

There is no doubt but that *Rock* itself was carefully confined to the testimony of the defendant. That is apparent not only from the footnote added by the Court but from the overall text of the majority opinion. On several occasions, the Court noted that it was dealing only with the testimony of the defendant and stressed as the basis for its holding the overarching right of the defendant in a criminal case to tell his or her story in his or her own words. *See* Antonia F. Giuliana, *Between Rock and a Hurd Place: Protecting the Criminal Defendant's Right to Testify after Her Testimony Has Been Hypnotically Refreshed*, 65 FORD. L.REV. 2151, 2186 (1997). Indeed, subsequent pronouncements from the Supreme Court, from Justice Blackmun, who authored the majority Opinion in *Rock,* and from Justice Marshall, who joined that Opinion, indicate that the ruling in that case was based on the special significance of the defendant's right to testify. Writing separately in *Clemons v. Mississippi*, 494 U.S. 738, 769, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), Justice Blackmun cited *Rock* for the proposition that the Court had attached Constitutional significance "to an individual's interest in presenting his case directly to the finder of fact," noting the language used in *Rock* that "the right to be heard, which is so essential to due process in an adversary system of adjudication, [can] be vindicated only by affording a defendant an opportunity to testify before the factfinder." Dissenting in *Perry v. Leeke*, 488 U.S. 272, 291, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), Justice Marshall cited *Rock* as supporting the principle applied in *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) that a defendant in a criminal case enjoyed a "unique status" and could not, in all instances, be treated the same as other

witnesses. Most significant, in *United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the Court characterized *Rock* as follows:

> "In holding that the exclusion of [Rock's hypnotically enhanced testimony] violated the defendant's 'right to present a defense,' we noted that the rule deprived the jury of the testimony of the only witness who was at the scene and had firsthand knowledge of the facts [citation omitted]. Moreover, the rule infringed upon the accused's interest in testifying in her own defense—*an interest that we deemed particularly significant, as it is the defendant who is the target of any criminal prosecution* [citation omitted]. *For this reason, we stated that an accused ought to be allowed 'to present his own version of events in his own words.'*"

(Emphasis added). The California Supreme Court also created that limited exception, for the same reason, in its second *Shirley* opinion.

The choice that faces us, then, is whether to extend *Rock* beyond the limited scope given it by the Supreme Court itself. We have, essentially, four options: (1) adhere to *Collins* except with respect to a testifying defendant in a criminal case; (2) abandon *Collins,* on either a Constitutional or common law basis, in favor of a general admissibility (*Harding*-type) approach, a *Hurd*-type approach, or a totality of the circumstances approach with respect to any *defense witness* in a criminal case; (3) abandon *Collins,* on a common law basis, in favor of one of those alternative approaches for *all witnesses* in a criminal case; or (4) abandon *Collins,* on a common law basis, in favor of an alternative approach for witnesses generally, *in both criminal and civil cases.*

In making that determination, we need to recall the fundamental underpinning of *Collins*—that hypnosis, as a memory enhancer, is a scientific technique to which the standard of acceptability set forth in *Frye* and *Reed* applies and that the technique had not gained general acceptance within the relevant scientific community. Although in *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* 509 U.S. 579, 113

S.Ct. 2786, 125 L.Ed.2d 469, the Supreme Court, relying largely on Federal Rules of Evidence 104, 403, and 702, rejected the *Frye* condition that the technique be "generally accepted" in favor of the standards set forth in Fed.R.Evid. 702, we have not abandoned *Frye* or *Reed.* In adopting our counterpart to Fed.R.Evid. 702, Maryland Rule 5–702, in 1994, we blessed a Committee Note expressly pointing out that promulgation of the Maryland rule was not intended to overrule *Reed* or other cases adopting the *Frye* standard, and that "[t]he required scientific foundation for the admission of novel scientific techniques or principles is left to development through case law." We have not been asked in this case to abandon *Frye/Reed,* either as a general standard or, other than as a byproduct of extending the Constitutional exception enunciated in *Rock* to all defense witnesses, as the standard applicable to hypnotically-enhanced memory, and we therefore shall not do so. We thus adhere to the rule, as a matter of Maryland common law, that hypnosis is a scientific technique that is subject to the *Frye/Reed* standard.

There is nothing in the record of this case to indicate that hypnosis as a memory enhancer has gained general acceptance in the relevant scientific community since 1983. No experts testified in that regard and no scientific literature was presented to the court. At least as of 1986, it appears that every court that applied a *Frye* test concluded that hypnosis as a memory enhancer failed to meet the test, and even five years later the consensus seemed to be that the technique was not regarded as reliable. *See* Gary M Shaw, *The Admissibility of Hypnotically Enhanced Testimony in Criminal Trials,* 75 MARQ. L.REV. 1, 18 (1991); also Paul Giannelli, THE ADMISSIBILITY OF HYPNOTIC EVIDENCE IN U.S. COURTS, *Int. J. of Clinical and Experimental Hypnosis,* 43, 212–233 (1995). As noted, the *Rock* majority itself acknowledged that the technique was "controversial" and that both the medical and legal view of its appropriate role was "unsettled." *Rock v. Arkansas, supra,* 483 U.S. at 59, 107 S.Ct. 2704.

Faigman, Kaye, Saks, and Sanders, writing in 1997, report a consensus within the scientific community on six points re-

garding hypnosis, among them that "any increase in accurate memories during hypnosis is accompanied by an increase in inaccurate memories," that "hypnosis may compromise the subject's ability to distinguish memory from imagination or fantasy," and that "when hypnotic (as opposed to nonhypnotic) techniques are used to interrogate, subjects later report being more certain of the content, even when it is inaccurate." 1 MODERN SCIENTIFIC EVIDENCE § 12–2.2.3 (1997). *See also* American Medical Association Council on Scientific Affairs (1985), SCIENTIFIC STATUS OF REFRESHING RECOLLECTION BY THE USE OF HYPNOSIS, *Journal of the American Medical Association, 253, 1918–1923.* Giannelli and Imwinkelried note the conclusions drawn from a 1994 meta-analysis of 24 research studies that "(1) increased recall accuracy for hypnotized subjects has not been substantiated at this time; (2) control subjects had a higher accuracy rate for lineup identifications than hypnotized subjects, who had more false alarms; and (3) hypnotized subjects are more confident about their recall accuracy." 1 SCIENTIFIC EVIDENCE § 12–4(A) (2d ed. 1998 Supp.). Perhaps the most telling piece of evidence in this regard is that Dr. Orne, whose view that hypnosis as a memory enhancer could be made reliable through the use of the safeguards he recommended was the underpinning of *Hurd,* has changed his opinion and now believes that "hypnotically induced memories should *never* be permitted to form the basis for testimony by witnesses or victims in a court of law." Orne, Whitehouse, Dinges, & Orne, RECONSTRUCTING MEMORY THROUGH HYPNOSIS: FORENSIC AND CLINICAL IMPLICATIONS, in *Hypnosis and Memory* 21, 50 (H.M. Pettinati ed.1988); also Orne, COMMENTS ON THE DRAFT HOME OFFICE GUIDELINES, 5 British J. Experimental & Clinical Hypnosis 37. 42 (1988); Orne, Soskis, Dinges, & Orne, HYPNOTICALLY INDUCED TESTIMONY, in *Eyewitness Testimony: Psychological Perspectives* 171, 211 (G. Wells & E. Loftus eds.1984).

In the face of this overwhelming and largely uncontradicted evidence, we find no justification to depart, as a matter of common law, from the approach we took in *Collins.* The fact is that both the scientific community and a majority of the

courts continue to view hypnosis, when used as a memory enhancer, as unreliable and, in terms of testimony in court, as likely to produce false recollections and inaccurate testimony that cross-examination may be unable to expose. The same deficiencies that were prevalent in 1983 appear to remain prevalent today.[9]

*Rock v. Arkansas* obviously stands as a Constitutionally-based exception to the predominant rule that testimony based on hypnotically enhanced recollections is not admissible, but we find no Constitutional requirement to extend that exception to other defense witnesses. The entire underpinning of Burral's proposed extension of *Rock* is the Court's reference to the Sixth Amendment right to compulsory process and to *Chambers v. Mississippi.* Those references need to be viewed in context, however, especially in light of the Court's clear intent to limit its holding to testifying defendants. The right to compulsory process *is* a Constitutional source of a defendant's right to testify—a right, as the Court has noted on several occasions, that did not exist at common law—and that is all that it was cited to establish.

*Rock* was obviously an unusual case—one in which the rule barring testimony based on hypnotically-enhanced memory precluded the defendant herself, who was the only live witness to what had occurred, from presenting a defense, from telling her story. To take the Court's reference to the right of compulsory process, made in that context, and extend it to a Constitutional doctrine effectively precluding a State from

---

9. Judge Chasanow, in dissent, argues that a *Collins* rule should not apply when the witness is a defense witness who has been subjected to hypnosis by the State. He raises the spectre of the State maliciously hypnotizing known defense witnesses in order to render their testimony inadmissible. That is not, of course, what happened here, so we need not decide in this case what an appropriate response would be to that situation. Ms. Wallech was certainly not a defense witness, or even an anticipated defense witness, when she was hypnotized. The hypnosis occurred early in the investigation—seven years before trial—when Schell, not Burral, was the prime suspect. Hypnosis is a valid and accepted technique for use in police investigations. There is utterly nothing in this record to suggest that Ms. Wallech was hypnotized in order to render her incompetent as a defense witness.

enforcing neutral and well-founded rules of evidence against defense witnesses in a criminal case would have the most profound implications, well beyond what was at issue in *Rock*. Would the testimony of a defense witness, who, by reason of tender age or mental disability is unable to understand an oath and is incompetent for that reason, nonetheless be admissible as a Constitutional imperative? Is a defense witness no longer subject to the hearsay rule? Until *United States v. Scheffer*, supra, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413, could it have been argued that polygraph evidence supporting the testimony of a defense witness was Constitutionally admissible? Federal Rule of Evidence 605 and its Maryland counterpart, Rule 5–605, provide that the judge presiding at a trial may not testify in that trial as a witness. Would those rules apply if the judge is called as a defense witness?

The *Rock* Court's reference to the right of compulsory process can be given proper effect without extending it beyond what we believe was intended. That reference, as noted, was only one of three sources cited by the Court as establishing the right of a defendant to testify in his or her own defense. The other two—the due process right to be heard in one's own defense and the Fifth Amendment right to testify or not—are peculiar to defendants. No other court in the country has so extended the *Rock* holding on a Constitutional basis, and in light of the Supreme Court's own expressed limitation, we shall not be the first to do so. If the high court believes that the right of compulsory process precludes a *Collins* approach to the testimony of other defense witnesses, it will, in due time, inform us of that belief.

JUDGMENT AFFIRMED, WITH COSTS.

Dissenting Opinion by CHASANOW, J. in which BELL, C.J., joins.

Dissenting opinion by ELDRIDGE, J.

CHASANOW, Judge, dissenting.

I respectfully dissent. The majority holds that the State can preclude a defendant from questioning an eyewitness with

exculpatory testimony because a State agent hypnotized that witness. The majority cites many of the vast number of cases and articles concerning hypnosis, and misapplies them to create a rigid, inflexible, illogical, and probably unconstitutional *per se* rule of exclusion precluding a defendant from calling a witness or questioning the witness because the State interrogated that witness under hypnosis.

Post-hypnotic testimony unquestionably has some value, but it is fraught with potential problems. As one evidence text notes, "the most directly pertinent studies do suggest that in certain circumstances hypnosis can enhance memory. The problem is that it also appears that it can *alter* memory." JOHN W. STRONG, 1 MCCORMICK ON EVIDENCE § 206, at 918 (4th ed.1992) (emphasis in original)(footnote omitted). Over 100 years ago, in what was probably the first case to deal with the issue of hypnotized witnesses, a court made the statement, "the law of the United States does not recognize hypnotism." *People v. Ebanks,* 117 Cal. 652, 49 P. 1049, 1053 (1897). Without any critical analysis of the divergent issues associated with hypnosis, this Court expands the above statement into an inflexible, rigid, and unreasonable approach. While I agree that statements made by a person while under hypnosis are suspect and should generally not be admitted, at least not without safeguards, the instant case concerns a slightly different issue—the admissibility of post-hypnotic testimony of a witness whose recollections have been enhanced or possibly evoked by the party objecting to the witness's testimony. This is analogous to saying that a defense eyewitness may be precluded from testifying because a police officer beat the witness to enhance the witness's memory. In neither case should the improper actions of the State bar the defendant from calling the witness. If the State, without the consent of the defendant, has done something to a witness that may have impaired the witness's memory, then that ought to be a basis for impeachment by the State, not disqualification of the defense witness. The State should not be able to unilaterally make witnesses unavailable to the defense by secretly hypnotizing them as part of the police investigation.

## THE IMPORTANCE OF THE HYPNOTIZED WITNESS

It was not clearly established where the stabbing of Jeffrey Fiddler actually occurred. In the instant case, as well as in the trial of the co-defendant Edward Stouffer, the State seemed to present alternative inferences as to where the killing occurred. As we noted, "the *State's* evidence as to where the beating or the killing occurred was in dispute. There was some evidence indicating that it may have occurred in or just outside of Robert Schell's apartment at 12 Elizabeth Street, in Hagerstown; other evidence suggested that it occurred in a field or parking lot." *State v. Stouffer*, 352 Md. 97, 100, 721 A.2d 207, 208 (1998). If, in fact, the stabbing occurred just outside 12 Elizabeth Street, then Lisa Wallech was an eyewitness to the stabbing and would have given testimony that it was Robert Schell, and not the defendant, who did the stabbing.

The defendant told the police that Robert Schell was the killer. This contention was belittled by the State in its opening statement and throughout the trial, but it would have been supported by the excluded testimony of Ms. Wallech. In her first statement to the police, Ms. Wallech said she saw a fight outside of 12 Elizabeth Street between Robert Schell and a person whom she at first believed was Jimmy Fiddler (the victim's brother). The defense's contention was that it was the victim, not the victim's brother, that Ms. Wallech saw Schell fighting with and that during this fight the victim was stabbed. When questioned by police as to whether she was "sure this fight was between Jimmy [Fiddler] and Bobby [Schell] and not between Bobby and Jeff [Fiddler]," Ms. Wallech responded, "I can almost swear to it." When police continued to press her about whether Bobby Schell was fighting with the victim or the victim's brother, Ms. Wallech said she was "almost positive" the fight involved the victim's brother and not the victim. In response to the question: "But you are not positive are you?" She answered, "No." The hypnosis session with Ms. Wallech was held at the request of a Hagerstown police detective. The reason given was: "[s]he was drinking the night of the murder and she is having

trouble remembering details of the events that occurred the night of the murder." The hypnotist was a Maryland State Police "Investigative Hypnotist."

The day after Ms. Wallech was hypnotized she gave a second written signed statement to a Hagerstown police detective. This nine-page statement is in question and answer form. It is initialed on each page by Ms. Wallech, and on the last page, she signed the statement, indicated she read it, and stated that the matters set forth were true. Because her statement is in writing and signed by Ms.Wallech, had she been permitted to be questioned by the defendant the statement could be introduced as substantive evidence if her testimony deviated from its contents. Maryland Rule 5–802.1(a). Thus, the defendant was precluded from eliciting exculpatory eyewitness testimony from Ms. Wallech.

Ms. Wallech's second statement contained extremely important exculpatory evidence and was much more detailed than her first statement. Her second statement relates that she now remembers that it was the victim Jeffrey Fiddler that Bobby Schell was fighting with outside of 12 Elizabeth Street. She accurately describes the clothing each was wearing and the knife Bobby Schell was wielding during the fight. In addition, although she never clearly observed the knife penetrate the victim, she did see that during the fight the victim's back was slashed. This is consistent with the autopsy report indicating a "transversely oriented $1 \times \%$ inch slit-like [wound] with a sharp commissure toward the right" on the victim's back. Ms. Wallech further described how the victim received a bloody nose and a slash on the right hand, which are also consistent with the autopsy report and the autopsy photographs.

Ms. Wallech acknowledged in her second statement that she previously told the detectives that she initially thought it was the victim's brother who was in the fight with Bobby Schell, but that now she is positive that Bobby Schell was fighting with the victim while brandishing the knife. She stated that a reason why her earlier version was incorrect was that "Bobby

kept on telling me to forget about everything that happened that night and I was under the influence of alcohol, so I did, and that's why I didn't remember the fight."

The description of the wounds Ms. Wallach saw being inflicted, which matched the victim's injuries, are strong corroboration of her post-hypnotic eyewitness account of Bobby Schell fighting with and stabbing the victim. There was also no indication that the victim's brother sustained any wounds or bruises that evening. To apply a *per se* rule precluding the defense from calling this exculpatory eyewitness because the State chose to have her hypnotized by a State investigative hypnotist denies the defendant due process of law.

## ADMISSIBILITY OF POST–HYPNOTIC TESTIMONY

This Court holds that, because Ms. Wallech's change in memory came after she was hypnotized, under the *Frye/Reed* test, *see Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), that there is insufficient scientific proof that her post-hypnotic memory is reliable. This converts the *Frye/Reed* test from a test for admissibility of questionable scientific evidence into a rule of exclusion of eyewitness testimony. The *Frye/Reed* test is primarily a way to determine whether new scientific test results ought to be admissible in evidence. If the new test results are generally accepted in the scientific community, then they ought to be accepted in the courtroom. In the instant case, we are not dealing with admissibility; we are dealing with exclusion of eyewitness testimony from a sane, mentally competent witness. Eyewitness testimony, even if based on refreshed recollection, is generally admissible unless it is proven to be so unreliable as to be of no assistance to the finder of fact. *See* Md. Rule 5–402. There is certainly no general acceptance in the scientific community that hypnosis always produces unreliable memory; we know that sometimes it enhances memory and sometimes it evokes memory. Should uncertainty be enough to exclude refreshed eyewitness testimony or should there be a case-by-case analysis, albeit

with a strong presumption against the reliability of post-hypnotic memory?

Since Ms. Wallech now claims to have an accurate memory of seeing the fatal fight,[1] it ought to be the State's burden to prove by scientific evidence that her memory is unreliable, not the defense's burden to prove an eyewitness's memory is reliable. The party objecting to testimony about a witness's observations always has the burden of proving why the witness should not be permitted to testify. In the instant case, only the police know what happened during the hypnosis session with the witness, and there was not a shred of scientific evidence that the hypnotic session conducted by the State distorted rather than refreshed or enhanced Ms. Wallech's memory. Generally, when a witness on the witness stand repudiates a prior inconsistent statement and claims to now remember the event differently than recounted in a prior statement the witness is not precluded from testifying to the new memory of the event. Even if there is strong evidence that the new "memory" is manufactured because the witness was bribed, threatened, coerced, and beaten to induce the new version, that is generally a matter for cross-examination, not exclusion of the witness's testimony. Hypnotism, like bribes, threats, and intimidation, may change a witness's recollection of an event, but it is universally recognized that hypnotism can also enhance memory and, although all new post-hypnotic memory should be suspect, it should not always be excluded.

The majority seems to suggest that the overwhelming weight of authority adopts a *per se* exclusion of post-hypnotic refreshed memory. This is incorrect. The federal courts and a significant number of states recognize that the more reasoned approach is that there should be an individualized determination of whether the manner in which the hypnosis was performed and the circumstances of the case indicate that

---

1. Although Ms. Wallach was uncertain as to whether the victim was Jimmy or Jeffrey, she was certain about the nature of the wounds inflicted, the clothing worn during the incident, and that the perpetrator was Robert Schell.

the witness's post-hypnotic memory is too unreliable to be of benefit to the trier of fact. *See Borawick v. Shay,* 68 F.3d 597, 605 (2d Cir.1995)("[T]he approach most frequently taken by the federal courts is a so-called case-by-case or totality-of-the-circumstances approach. * * * [T]hese courts conclude that the district court should be given discretion to balance all of the factors to determine the reliability of the evidence and the probative versus prejudicial effect of the testimony." (Citations omitted), *cert. denied,* 517 U.S. 1229, 116 S.Ct. 1869, 134 L.Ed.2d 966 (1996)); *Harker v. State of Maryland,* 800 F.2d 437, 442 (4th Cir.1986)("[T]he general view of federal courts [is] that prior use of hypnosis on a witness goes to the weight to be given his testimony rather than its admissibility."); *State v. Brown,* 337 N.W.2d 138, 147, 151–53 (N.D. 1983)("The majority of jurisdictions appear to have declared that hypnotically induced testimonial recall generally poses no barrier to admissibility, but, rather, affects only the weight of the testimony."). *See also Armstrong v. Young,* 34 F.3d 421, 429–30 (7th Cir.1994), *reh'g denied en banc; Boykin v. Leapley,* 28 F.3d 788, 793 (8th Cir.1994); *White v. Ieyoub,* 25 F.3d 245, 247 (5th Cir.1994); *Beachum v. Tansy,* 903 F.2d 1321, 1326 (10th Cir.), *cert. denied,* 498 U.S. 904, 111 S.Ct. 269, 112 L.Ed.2d 225 (1990); *Bundy v. Dugger,* 850 F.2d 1402, 1414–20 (11th Cir.), *reh'g denied en banc,* 859 F.2d 928, *and cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1988); *Robison v. Maynard,* 829 F.2d 1501, 1507–08 (10th Cir.1987); *Clay v. Vose,* 771 F.2d 1 (1st Cir.1985); *McQueen v. Garrison,* 814 F.2d 951, 958 (4th Cir.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987); *United States v. Awkard,* 597 F.2d 667, 669 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 and 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 383 (1979); *Boykin v. Bloomsburg Univ.,* 893 F.Supp. 400, 407 (M.D.Pa.1995), *aff'd without op.,* 91 F.3d 122 (3rd Cir.1996), *cert. denied by Mirin v. Eyerly,* —— U.S. ——, 117 S.Ct. 739, 136 L.Ed.2d 678 (1997); *Stafford v. Maynard,* 848 F.Supp. 946, 957–58 (W.D.Okla.1994); *Barnes v. Henderson* 725 F.Supp. 142 (E.D.N.Y.), *aff'd without op.,* 923 F.2d 843 (2d Cir.), *cert. denied,* 499 U.S. 925, 111 S.Ct. 1323, 113 L.Ed.2d

255 (1989); *United States v. Waksal,* 539 F.Supp. 834 (S.D.Fla.), *rev'd on other grounds* 709 F.2d 653 (11th Cir. 1982); *United States v. Narciso,* 446 F.Supp. 252, 281 (E.D.Mich.1976); *Chamblee v. State,* 527 So.2d 173, 174–76 (Ala.App.1988); *People v. Romero,* 745 P.2d 1003, 1016 (Colo.), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1987); *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571, 577–80 (1984); *House v. State,* 445 So.2d 815, 826–27 (Miss.1984); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *State v. Varela,* 112 N.M. 538, 817 P.2d 731, 733–36 (N.M.Ct.App.1991); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 264–68, 453 N.E.2d 484 (N.Y.1983); *State v. Johnston,* 39 Ohio St.3d 48, 529 N.E.2d 898, 903–07 (1988); *State v. King,* 84 Or.App. 165, 733 P.2d 472, 479–80 (Or.Ct.App.), *review denied,* 303 Or. 455, 737 P.2d 1248 (1987); *State v. Adams,* 418 N.W.2d 618, 622–24 (S.D.1988); *State v. Glebock,* 616 S.W.2d 897, 904–05 (Tenn. Crim.App.1981); *Zani v. State,* 758 S.W.2d 233, 243–44 (Tex. Crim.App.1988)(*en banc* ); *State v. Armstrong,* 110 Wis.2d 555, 329 N.W.2d 386, 391–98 (Wis.), *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Prime v. State,* 767 P.2d 149, 153 (Wyo.1989). This might be the better approach, especially in light of the almost universal recognition that hypnosis can be therapeutic and can be an aid to memory. There should, however, be a presumption against admissibility of post-hypnotic changes of memory, and a jury should be instructed as to the dubious reliability of post-hypnotic memory, but there should be no *per se* exclusion of all post-hypnotic memory.

In *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983), this Court held that hypnotically enhanced recollections are not admissible. Perhaps we should modify that absolute rule of inadmissibility to a presumption of inadmissibility, but we need not address this in the instant case because there is a constitutional due process reason why the majority is wrong. Regardless of any general rule precluding testimony concerning post-hypnotic memory, the defendant's constitutional right to call witnesses on his own behalf should require that Ms. Wallech be permitted to testify.

## ROCK V. ARKANSAS

By adopting its inflexible *per se* inadmissibility test, this Court seems to be taking judicial notice that post-hypnotic recall can never be reliable enough to be admissible in evidence. That view was rejected by the Supreme Court on constitutional grounds in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In *Rock*, the Supreme Court held that there is no scientific evidence that "hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her [post-hypnotic] version of the events for which she is on trial." 483 U.S. at 61, 107 S.Ct. at 2714, 97 L.Ed.2d at 52. If, as the Supreme Court held in *Rock*, there can be no *per se* rule excluding a defendant's post-hypnotic testimony, then there should be no *per se* rule excluding a defense witness's post-hypnotic testimony.

The majority analyzes *Rock* as being exclusively applicable to the defendant as a witness and having no applicability to other defense witnesses. It states: "There is no doubt but that *Rock* itself was carefully confined to the testimony of the defendant. That is apparent not only from the footnote added by the Court but from the overall text of the majority opinion." 352 Md. 707, 736, 724 A.2d 65, 79 (1999). There is, however, far more historical and constitutional protection for the defendant's right to call witnesses than for the defendant's right to testify. As the Supreme Court pointed out in *Rock*, at common law criminal defendants were precluded from testifying because of the possible untrustworthiness of a party's testimony. *Rock*, 483 U.S. at 49, 107 S.Ct. at 2708, 97 L.Ed.2d at 45. In addition, the Constitution contains no express provision granting a defendant the right to testify, but there is an express provision in the Sixth Amendment that grants a defendant the right to call "witnesses in his favor." *Rock*, 483 U.S. at 52, 107 S.Ct. at 2709, 97 L.Ed.2d at 46. In fact, the Supreme Court in *Rock* recognized that a defendant's right to testify may be derived from the defendant's constitutional right to call witnesses. Thus, there is little justification for

saying that the Constitution precludes a state from adopting a *per se* rule barring a defendant's right to offer post-hypnotic testimony but the Constitution does not preclude a state from adopting a *per se* rule barring defense witness's post-hypnotic testimony.

The majority's references to Supreme Court decisions that cite *Rock* as support for a defendant's right to testify on his or her own behalf in no way undermine *Rock's* obvious implications regarding a defendant's constitutional right to call witnesses. The Court in *Rock* explicitly compared the right of a criminal defendant to testify on his or her own behalf to one's right under the Compulsory Service Clause to "call witnesses in his favor." 483 U.S. at 52, 107 S.Ct. at 2709, 97 L.Ed.2d at 46 (quoting the Sixth Amendment). The Court reasoned that the Sixth Amendment right to call witnesses is incomplete unless it is interpreted to include the defendant's own right to testify. *Id.* While my research uncovered no cases that either rejected or accepted an extension of the *Rock* holding to a witness called by the defendant, and the majority cites no such cases, the applicability of the *Rock* ban against *per se* rules of inadmissibility to witnesses called by the defendant seems self-evident. As Colorado Supreme Court Justice Lohr observed:

> "Although the actual holding of *Rock* is limited to a rejection of a per se rule that prevents a defendant from testifying, the language of the opinion has broader implications. The right to testify protected in *Rock* is grounded in part in the sixth amendment's compulsory service clause, which grants the defendant the right to call 'witnesses in his favor,' and this suggests that the approach in *Rock* should also apply to the defendant's witnesses.... [I]t is difficult to find a principled basis for allowing the defendant to offer post-hypnosis testimony while excluding that of other witnesses.... The opinion in *Rock* seems to say that the federal constitution requires flexible guidelines that leave the trial court with discretion to assess the reliability of the testimony in each individual case."

*People v. Romero,* 745 P.2d 1003, 1021 (Colo.1987)(specially concurring).

It is also obvious that a party should not be able to unilaterally disqualify the other side's witnesses. The State's choice to interrogate a witness by its own "investigative hypnotist" raises an additional due process reason why Ms. Wallech's post-hypnotic testimony should not be excluded in the instant case. Should a state agent, *i.e.,* a police investigative hypnotist, be permitted to interrogate a witness in a manner that precludes that witness from later being called by a defendant to give exculpatory evidence? The answer should be a resounding "no." In fact, some cases have even held that a defendant may be entitled to a dismissal of the charges where the prosecution has hypnotized an eyewitness on the theory that an improper hypnotic interview deprived the defendant of a material witness who could not be rehabilitated. *See, e.g., State v. Long,* 32 Wash.App. 732, 649 P.2d 845 (1982).

We can assume the reason why the police chose to have Ms. Wallech hypnotized was because the investigative officers believed hypnosis would be a reliable aid in refreshing the witness's memory. The State should not be permitted to now claim that its hypnotic interrogation of the witness rendered the witness's memory so unreliable that the defense cannot call that witness to testify. If there is no absolute or *per se* bar to a defense witness's post-hypnotic testimony, the defendant in the instant case is entitled to a new trial with an individualized determination to be made about the reliability of Ms. Wallech's post-hypnotic recall. At that hearing the State should have the burden of proving why its hypnosis of Ms. Wallech rendered her post-hypnotically-refreshed memory of no benefit to the trier of fact. Little, if any, weight should be given to any State complaint that its chosen "hypnotic investigator" was incompetent or was biased against the State. In addition, the trial judge may consider the fact that the witness's post-hypnotic memory seems to be more detailed, and perhaps more reliable since many aspects of the second statement, including her extensive description of the victim's multiple wounds, were verified.

## EXCLUSION OF DEFENSE WITNESS BASED ON STATE'S ACTION AFFECTING THE WITNESS'S MEMORY

In footnote 9, the majority makes its own fact finding that Ms. Wallech was not "hypnotized in order to render her incompetent as a defense witness." This may be true, but we do not have any evidence or trial court fact finding, and how the majority divines this is certainly not contained in the record. All we know is that the State arranged for the hypnosis and now objects to the testimony about the witness's vastly enhanced and fully substantiated hypnotically revived memory. There is no basis for ruling out the possibility that this State agent was afraid that the witness's initial foggy memory might in time be naturally revived in a way not helpful to the State, and the purpose of the hypnotic session was to assure that it would be revived in a way the State agents desired. If so, the State could omit any mention of the hypnosis, or if they did not like what the hypnotically revived memory revealed, the State could disclose the hypnosis and preclude the witness's post-hypnotic testimony. The majority ascribes some bad motives to the detective, but excludes the possibility that his motive was to do what the State eventually did, *i.e.*, bar the witness's post-hypnotically refreshed memory when it proved to be unfavorable to the State.

We know the use of hypnosis by law enforcement agencies is on the increase and is now being used extensively. "Since the early 1970's, a growing number of law enforcement agencies have been hypnotizing crime victims and witnesses in order to penetrate clouded or repressed memories of the episode and elicit details useful as new investigate leads, to facilitate the identification of a suspect, or to resolve contradictions or fill gaps in the subject's expected courtroom testimony." 77 A.L.R. 4th, § 2[a], at 932–33 (footnote omitted). We know the State Police employ at least one investigative hypnotist. While I do not like raising the possibility of improper police action, there is the theoretical possibility that the police will use hypnosis to interrogate witnesses with foggy memories, and if the memory adduced under hypnosis is

favorable to the prosecution, the police hypnotist would implant the post-hypnotic suggestion that the witness will not remember any hypnotic interrogation. On the other hand, if the witness's hypnotically enhanced memory is unfavorable to the prosecution, the hypnosis will bar use of that testimony by the defendant.

This Court's holding that a witness's observations recounted for the first time during hypnosis are inadmissible in a trial may cause incalculable harm. If the State can preclude a witness from testifying about memories first disclosed under hypnosis, I assume defendants may also do so. Just by way of example, say a parent who has been abusing a child suspects the police are going to interview the child, so the parent takes the child to a hypnotist. Under hypnosis the child is asked for the first time if there was abuse by the parent. Of course, the child will answer in the affirmative but, according to the majority's holding, the child will never be able to testify to the abuse because the memory was first disclosed under hypnosis. For the many reasons expressed herein, I respectfully dissent.

Chief Judge BELL has authorized me to state that he joins in the views expressed in this dissenting opinion.

ELDRIDGE, Judge, dissenting.

I would reserve and remand for a new trial for the reasons set forth in that portion of Judge Chasanow's opinion dealing with the Supreme Court's opinion in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).